THE PEOPLE v. ALEXANDER MONTAGUE.

[See 70 Mich. 157.]

*Criminal law — Conduct of prosecutor — Argument — Opening of case.*

1. In this case it is held that it is apparent from the whole record that the trial was had under circumstances very hostile to fair procedure, and that the jury had laid before them in a very offensive way considerations having no proper bearing on the issue which they had to try, and the conviction is set aside and a new trial granted.

2. The following general propositions are summarized from the opinion of Mr. Justice CAMPBELL:

*a*—It would not be conducive to justice, or at all practicable, to interrupt criminal trials to examine into charges of alleged improper conduct of the prosecuting officer and others, out of court, in furnishing refreshments to members of the jury, or conversing in their presence, with a view to the discharge of the jury if the charges are sustained.

*b*—There is great impropriety in a prosecuting officer consorting with jurors, and offering them entertainment of any sort.

*c*—The most dangerous form of influence is that which brings jurors and parties or counsel into familiar intercourse, which offers opportunity for insidious and indirect means of persuasion and conciliation, which operates sometimes unconsciously, but none the less forcibly; and if the court is satisfied that enough has happened to involve serious risk of undue bias, especially in cases where feeling is easily excited and prejudice aroused, the verdict should be set aside.

*d*—Under our laws it is settled that the public is as much interested as the defense in having no person unjustly condemned.

*e*—It is not legally presumed that a prosecuting officer will pursue a prisoner whom he believes to be innocent, or resort to any means to deprive any one of his legal rights, or to suggest false charges, or use improper testimony against him.

*f*—It has been held from time immemorial that the trial court itself is bound to see and provide affirmatively that no injustice is done the prisoner by the improper course of a prosecu-

tor; and when this goes so far that the right to a fair trial is evidently infringed, this Court will correct the wrong.

*g*—Under our practice the argument of the case belongs to the close of the testimony, and not to the opening, and must be based on what actually appears in proof.

*h*—The only legitimate purpose of an opening is so to explain to the jury the nature and elements of the issue they are to try, that they may understand the bearing of the testimony which is thereafter put in, and any misrepresentation of what is covered by such issue has a tendency to prevent them from giving to the testimony, when put in, a proper comprehension of its bearings, or of its real force.

Exceptions from Tuscola.     (Beach, J.)     Argued June 27, 1888.     Decided October 5, 1888.

Respondent was convicted of adultery.     Conviction set aside and a new trial granted.     The facts are stated in the opinion

*Wixson & Quinn* and *C. P. Black,* for respondent.

*Moses Taggart,* Attorney General, *T. W. Atwood,* Prosecuting Attorney, for the people.

CAMPBELL, J.     Respondent was convicted in the circuit court for the county of Tuscola of having, on the 8th day of November, 1887, committed adultery with the wife of Schuyler Arnold.     He was, after exceptions had been allowed, admitted to bail, but subsequently sentenced. This sentence we held void, on *habeas corpus,* as beyond the power of the court at that stage of the proceedings. 70 Mich. 157 ( 38 N. W. Rep. 15 ).

The exceptions appear in a somewhat full form, including a history of the proceedings on trial, and on a subsequent motion for a new trial for improper dealings of the prosecutor during the trial in and out of court, in addition to the ordinary exceptions.     Portions of the testimony do not appear.

After the trial was over a motion was made for a new

trial, based on a showing which alleged that, during the proceedings, members of the jury had been furnished liquor and cigars in public saloons by the prosecuting attorney. There was also some showing of conversations in the presence of the jury by different persons, tending to influence them. Counter-affidavits and showings were also made.

We are not called on to pass upon the facts upon this showing. It is sufficient to say that the circuit judge, in his written opinion on the motion, made this statement:.

" My own impression is now that, if the matter had been presented in the shape it is presented now, as fully as it is presented now, I should have set aside the proceedings as far as they had progressed. I am of opinion that that would have been the remedy to have stopped the trial right at that point and discharged that jury, and put the respondent upon trial with another jury, either at this term or the succeeding term of this court; and I apprehend that that is the remedy of the party, if he thinks that the matter is of grave consequence enough to bring it to the attention of the court."

This is said in connection with the idea suggested that the matter should have been brought to the court's attention during the trial, and not after verdict.

Aside from the very positive statements, under oath, of defendant's counsel, that they were not in a situation to present the matter during trial, we do not think that it would be conducive to justice, or at all practicable, to interrupt criminal trials to examine into side issues of this kind. When a jury has once been sworn in a criminal case, and the trial begun, there are legal difficulties in the way of breaking it off, which are very serious. Such a practice is not to be encouraged.

If there was, as the judge found there was, reason enough to make it proper to have the case submitted to a different jury, a new trial should have been granted.

71 Mich. 29.

He has exercised his judgment on the facts, and there was testimony upon them which he was called on to weigh. We are therefore relieved from weighing it. But we are bound to say that there is great impropriety in a prosecuting officer consorting with jurors, and offering them entertainment of any sort. No one would suppose the pecuniary value of the trifling articles or civilities extended could of itself operate like bribery. But there is danger of influence in the intercourse which attends such affairs going much further than money or corruption. Very few jurors are corrupt, and probably very few persons would venture to offer them bribes. The most dangerous form of influence is that which brings jurors and parties or counsel into familar intercourse, which offers opportunity for insidious and indirect means of persuasion and conciliation, which operates sometimes unconsciously, but none the less forcibly. It may be no harm is intended, but it is not always easy to tell whether there is or not. If courts are satisfied that enough has happened to involve serious risk of undue bias, especially in cases where feeling is easily excited, and prejudice easily aroused, the mischief ought to be checked. As the circuit judge was so satisfied here, the verdict should have been set aside. While frivolous reasons should not prevail to destroy a verdict, yet the purity of jury trials should be preserved.

The exceptions and objections to what was done in the course of the trial relate very largely to similar questions of official conduct on the part of the prosecution. There are some, however, not confined to this subject. It will not, in the view we take of the case, be necessary to do more than refer to the general outlines of the case to explain all that we deem it necessary to say; for it is very apparent from the whole record that the trial was had under cir-

cumstances very hostile to fair procedure, and that the jury had laid before them in a very offensive way considerations having no proper bearing on the issue which they had to try.

The single issue was whether respondent, on the 8th of November, 1887, committed adultery with Mrs. Arnold. The testimony of the offense was the testimony of the husband and his brother, each of whom swore positively to seeing it. No other witness had ever seen any improper familiarities between the parties, and there are no circumstances which had any legal tendency to establish any other instance of guilt. Leaving out their testimony, the case would be without any plausible foundation. It all depended on whether that testimony was true. This being so, it was important both for the people, interested in doing justice, and for the respondent, entitled to be protected against injustice, to have the trial kept clear from extraneous matter, and the rules of law governing procedure substantially guarded.

Permission was given to associate Mr. Huston as counsel with the prosecution. It was objected to for reasons of personal bias. There was a showing that he had been more or less involved in political and legal controversies with respondent's brother. But he testified that he could act fairly in the prosecution, and it did not appear he had been employed against respondent in this or other difficulties. We do not think the action of the circuit court, in permitting him to be employed in the case, was beyond its discretion.

The first series of objections to the proceedings on the trial relate to the opening by the prosecutor, which, it is insisted, was calculated and intended to raise false issues, and excite the passions and prejudices of the jury so as to prevent them from understanding the real issues, and lead them to look at the case in a false light.

It is not necessary, under our repeated decisions, to explain over again the place and functions of the prosecuting attorney under our system.   Under our laws it is settled that the public is as much interested as the defense in having no person unjustly condemned.   It is not legally presumed that a prosecuting officer will pursue a prisoner whom he believes to be innocent, or resort to any means to deprive any one of any of his legal rights, or to suggest false charges, or use improper testimony, against him.   Making all moral allowances for the excess of zeal and pride of success that are not always capable of removal from ambitious counsel, they are, nevertheless, excesses which are to be excused only, and not commended, and if carried very far are not allowable or excusable.   It has been held from time immemorial that the trial court itself is bound to see and provide affirmatively that no injustice is done the prisoner by the improper course of a prosecutor.   When this goes so far that the right to a fair trial is evidently infringed, we are bound to correct the wrong.

There can be no great difficulty in keeping within the legal bounds.   Under our practice the argument of the case belongs to the close of the testimony, and not to the opening, and must be based on what actually appears in proof.   The only legitimate purpose of an opening is so to explain to the jury the nature and elements of the issue they are to try that they can understand the bearing of the testimony which is thereafter put in.   They usually have no knowledge of the precise issues, except as thus presented.   Any misrepresentation of what is covered by the issues has a tendency to prevent them from giving to the testimony, when put in, a proper comprehension of its bearings, or of its real force.   The prosecuting attorney is supposed, when he files an information, to know what testimony he can rely upon to support

it, and is prepared to try his case upon. He is also presumed to know the rules of evidence. There is no occasion and no reason for attempting to influence the jury in advance by false or exaggerated statements, which he knows he cannot prove or will not be permitted to introduce. It is the duty of the court and jury to remain impartial, and without bias, until they hear from both sides. Under the former English practice, where 'the prosecutor argued his case before proving it, much scandal at times arose from the unfairness resorted to, and juries were sometimes so worked upon as to indicate their views in advance of any proofs. The practice here was changed to prevent criminal procedure from being abused for private malice, and to secure, as far as may be, a trial where no undue advantage is taken of official influence. Of course, every one knows that all the participants in criminal trials have the usual imperfections of humanity, and may follow zeal into excessive anxiety to succeed. But it is the business of courts to see that this shall not be done, so far as reasonably practicable. Sometimes this overzeal raises sympathy for the prisoner. But when an officer addresses a jury, with the authority always deferred to more or less of a minister of justice, it will not do to permit any serious abuse of his position.

There was a good deal in the opening in the present case that ought not to have been there. Some of it, however, could not have been ruled out as inadmissible, because it related to things which might have been relevant if they had been proved. The fact that they were not proved throws into stronger relief the assertions and insinuations that were not relevant, but were very well calculated to excite feeling. The record shows a very disgraceful occurrence in the fact of an outbreak of laughter and applause at the outcome of an objection by respondent's counsel, which received a rebuke from the

court, but which fairly indicated the overbearing manner of the prosecuting officer in treating the case as if it were on final argument, and having in it for discussion the irrelevant matter and the fictitious defense which, it was asserted, would be presented, but was not. Great stress was laid on the industry and narrow means of Mr. Arnold, and the necessity he felt himself to be in of using peculiar means to obtain proof to overcome the danger that respondent's wealthy surroundings and influences might enable him to secure false testimony. There can be no excuse for such methods of prosecution. The only possible effect they could have would be to excite passions and prejudices that, if existing, would prevent the possibility of a fair trial. The court took notice of this as an unfair · manner of opening, but it made no apparent difference, and was followed a few minutes after by the popular demonstration before referred to. Reference was also made, and repeated, under objection, to matters of hearsay, and to letters which, as stated, were of that character ; and reference was also made to an imaginary proposed defense, which was never attempted, but the reference to which would itself be prejudicial.

The questions raised on the main issue are not numerous, as defendant denied the truth of the charge, which, so far as direct testimony was concerned, was maintained by that of the complaining witness and his brother, who also swore to the only other facts and circumstances having any particular corroborative force. An outline of this will be sufficient to explain the legal questions.

Schuyler Arnold, the complaining witness, testified to the effect that, having a suspicion of a proposed visit of respondent to his premises, he sent for his brother Augustus, who was in Northville, to come up to Caro, and, on his coming, about dark, on November 8, 1887, he met him at the street in front of his dwelling, and took

him around, and put him in concealment under the wing
at the rear, where it made an angle with the main build-
ing in front. The main building was 24 feet square,
fronting east to the highway, with some vacant room on
the ground to the north. The wing was about 12 feet
by 27 running north and south, and leaving an open angle
about 2 feet deep at its north end, which did not go quite
up to the north line of the main house. This angle does not
seem to be lighted. The buildings were on posts raised from
18 inches to two feet from the ground, and with the foun-
dations boarded up, except for a short distance under the
wing. Schuyler Arnold, after going up town, and seeing
that respondent was in his brother's store, where he was
employed, went back, and crept in beside his brother under
the building. He testified that in a few minutes he heard
footsteps on the sidewalk, which he recognized as respond-
ent's, and so told his brother. Soon respondent and Mrs.
Arnold came around into the jog, and after some embraces
she went and looked round the back of the house, and
returned, and the parties had intercourse standing in the
corner. Schuyler seized a stick and hit respondent in
the leg, and Augustus flashed a dark lantern on them.
Defendant jumped away, and the Arnolds came out, when
he rushed back with threats; and he and Schuyler had a
fight, the latter beating respondent with a stick into the
street, where at length they separated. Schuyler testified
to seeing what he took to be similar conduct on October
17 and November 4, and to seeing him about the premises
on two or three other occasions, acting suspiciously.
Augustus testified to the principal fact on November
8, and to seeing defendant once about the premises in
October.

No one else testified to ever seeing improper familiarity
or peculiar conduct between the parties at any time. Mr.
Markham's name turns up several times as having acted

as agent or attorney of Schuyler to conciliate his wife early in the year after she had left him, and proposed to get a divorce against him for bad treatment, and as knowing some damaging facts; but he was not produced as a witness.

The only other testimony introduced by the prosecution, supposed to bear on the issue, was that of a woman, named Tillie Cork, who was a servant in the employ of Mrs. Arnold's mother, and who testified to some visits made by respondent at Northville while Mrs. Arnold was at the house. She does not testify to anything which she saw as occurring between them, and does not testify to anything as at that time appearing wrong to her. She testifies to respondent's asking a little girl whether she did not like him better than her father, and also that he would come when he did not have to keep so close. This was a witness whose name was indorsed on the information just before the trial. She had some hostility to the family, and had circulated reports of defendant's visits; but when and why does not appear.

The prosecution was rested on this testimony. Apart from impeaching testimony, the defense was confined to respondent's testimony denying or explaining the facts sworn to by the people's witnesses, and that of Mrs. Allen, Mrs. Arnold's mother, concerning the domestic relations of the Arnolds, and explaining defendant's acquaintance and conduct. The only pertinency of most of her testimony was to show that, instead of Schuyler Arnold's having any difficulty with his wife on Montague's account, and receiving her back on good behavior, the wife had left him, intending to seek a divorce for his own bad treatment of her, and he, chiefly through the intervention of Markham, was trying to get her back, and did get her back on promises of better treatment; that Montague's aid was appealed to for the purpose of

looking into the tampering by Arnold and Markham with Mrs. Arnold's correspondence, and that this was the explanation of his seeing Mrs. Arnold, and not doing so in her husband's presence.

In this connection Mrs. Allen was allowed to be cross-examined concerning certain communications between herself and her daughter, not in Montague's presence, or to which he was in any way privy. This was not proper, and the court seems to have been inclined to that opinion. The prosecution also managed to get before the jury and into the record a letter claimed to have been written by Mrs. Arnold to respondent, and stolen from him, which he is not proved to have read. It appears to have been written while the divorce proceeding was pending. These letters figured largely in the opening, and the prosecutor, in violation of proper rules of practice, succeeded in practically getting before the jury on these and other matters not admissible his own assertions and arguments. The frequency with which this method was resorted to was very reprehensible.

In the closing arguments both of the prosecuting counsel assumed to assure the jury of their own conviction that a clear case was made out against the prisoner. In the case of the prosecuting attorney this was done in the course of his address, in which he professed to give them instruction on the law of the case as one authorized to instruct them. While doing this he told the jury that no case ever presented in Tuscola county was stronger on the evidence; that in all his practice he never saw a witness who appeared to better advantage than Dr. Arnold; that there was not a single thing or circumstance going to discredit him in any particular; and he asked the jury to believe his testimony, because he felt it to be true; and that all the testimony corroborated him. There was more to a similar purport; and, among other things, he told

the jury that impeaching testimony which the court had admitted was incompetent, and should not be much considered by the jury.    The prosecuting attorney further, in this connection, said that a deputy-sheriff then in court had been circulating round to raise some question, and get some one to assail the reputation of Augustus Arnold, and that the whole talk, if there was any, was caused by that officer's working.    This was said after objection had been made, and the court's attention had been called to what was being said; but it was not stopped or censured, but was allowed to be repeated, and dwelt upon for some time.    The prosecuting attorney, also, in spite of remonstrance from the court, persisted in stating that the defense could have contradicted Arnold on a collateral question on which he was cross-examined.

This address dwells upon several matters not in evidence, and not only undertook to raise feeling, as on a contest between rich and poor, but attacked defendant's brother for using influences to affect the jury, of which there was no testimony whatever in the case.

It would be an unnecessarily extended task to point out all the portions of this address that introduced irrelevant and prejudicial means to inflame the jury and the by-standers, and carry the verdict by exciting passion and prejudice.    The record is remarkable and exceptional in the extent to which this course proceeded.

The charge is short, and the principal objection taken to it is that it failed to give a request, which was properly made, for an instruction that there was no direct evidence tending to show the commission of the alleged criminal act except the testimony of the two Arnolds, sworn as witnesses on this trial.    The course of the argument rendered it important to prevent the jury from confounding issues; and the charge did not, in the matter pointed out, give the jury the necessary caution.    It

was proper, however, to refuse the request that there was not sufficient evidence to convict. The testimony of the Arnolds, if true, made out an offense, and did not show that the adultery, if committed, was by Schuyler Arnold's procurement or consent.

It was, however, highly important that the issues should be kept clearly defined and distinguished. The facts sworn to were peculiar, and there was very little proof of antecedents to explain them. Whether respondent was guilty or innocent, it is certain the presentation of the case and the methods of trial were not calculated to give any assurance of a correct result.

The conviction should be set aside, and a new trial granted. Whether it should be in the same venue, is a question on which we cannot on this record make any suggestion.

The other Justices concurred.