## THE PEOPLE v. HARRY HULL.

*Criminal law—Homicide—Trial—Charge to jury—Viewing premises—Misconduct of juror—Intoxicating liquors.*

1. A jury in a criminal case, while going to, viewing, and returning from the premises where the offense was committed, should be kept under the supervision of an officer, so that no person can communicate with them, or express any opinion or give any direction in their hearing.

2. It is reversible error for a juror in a criminal case, while viewing the premises where the offense was committed, to drink liquor procured at a bar thereon owned by the principal witness for the prosecution, whether furnished by him in person or not.

3. The lengthy examination by the court of the principal witness for the prosecution, after he had been cross-examined by the respondent's counsel, coupled with the remark, in answer to an objection by respondent's counsel to certain questions, that it was made because the facts would be prejudicial to respondent, are held objectionable, as tending to prejudice the rights of the respondent, and as conveying to the jury the idea that, if the facts were drawn out as proposed by the court, they would be injurious to the respondent's case.

4. A portion of a charge in a criminal case which is argumentative, and tends to impress the jury that, in the opinion of the court, the respondent has not testified truthfully, is objectionable.

86 MICH.—2).

Exceptions before judgment from Wayne. (Reilly, J.) Argued June 18, 1891. Decided July 3, 1891.

Respondent was convicted of murder in the first degree. Conviction reversed, and a new trial ordered. The facts are stated in the opinion.

*John G. Hawley*, for respondent.

*A. A. Ellis*, Attorney General, and *S. W. Burroughs*, Prosecuting Attorney, for the people.

[The points of counsel are fully stated in the opinion. —Reporter.]

Long, J. The respondent was convicted in the Wayne circuit court, before a jury, of murder in the first degree. The case is brought up on exceptions before sentence.

The claim of respondent's counsel in this Court is:

1. That the court erred in not charging the jury that under the evidence the respondent could not be convicted of murder in the first degree.

2. That there was no evidence on which the respondent could have been justly convicted, and the court should have so instructed the jury; that the court should have granted the motion to quash, and limited the information to one for manslaughter.

3. That the circuit court improperly restricted the cross-examination of the witnesses for the prosecution.

4. That it was a violation of a constitutional right of respondent to take the jury to view the premises in the absence of the respondent.

5. That the jury, or some one of them, was guilty of misconduct in drinking intoxicating liquors while viewing the premises.

In order to get a complete understanding of the claims made, it will be necessary to state somewhat in detail the circumstances surrounding the transaction by which the deceased came to his death, as well as some of the cir-

cumstances occurring immediately preceding that time.

The respondent at the time the alleged crime was committed was about 21 years of age, and about a year before that had moved to the village of Highland Park, some 5 or 6 miles from the city of Detroit, upon a subdivision of land owned by his father. Prior to that time he had resided with his parents in the city. Just at the northern extremity of the village of Highland Park is an hotel kept by Mr. Beatty, called the "Highland Park House." On the 21st day of November, 1890, respondent had been in the city of Detroit, and on his way home was accompanied by one Ambrose Jones, who also lived at the village of Highland Park. They reached the Highland Park House in the evening of that day, and together entered the bar-room, where liquors were kept. Mr. Dubois, the deceased, was the hostler and general man of all work about the hotel. Mr. John A. Duncan was the bar-tender there, and George Johnson was employed about the hotel. These parties were all present when Hull and Jones reached there that evening, between 6 and 7 o'clock. Mr. G. W. Beatty, the proprietor and manager of the hotel, testified upon the trial that when he came out from supper he found the respondent and Jones in the saloon of the hotel, and that he talked with respondent about arranging to pay a bill for liquors which the respondent owed him, and in the course of the conversation he and respondent went out upon the back porch; the respondent leaning against the outer post of the porch, and the witness standing near the door. While they were in that position, and so talking about this bill, the respondent promised, if Mr. Beatty would come over the next morning, to let him have some chickens in payment of the bill. While the talk was going on between Beatty and the respondent, the deceased came out of the door, and said:

"I don't see what in hell is the use of going over
there again. I went over there once, and I don't want
to do it again. I don't suppose we would get any chick-
ens if we went."

The respondent was talking about the subdivision of
land upon which he lived, when the deceased said to
him:

"I don't think you care whether you pay what you
owe or not. You don't care much about paying your
debts. I pay my debts. I haven't any subdivision, but
I pay my debts, and that is more than you do."

The witness then described what took place thereafter,
as follows:

"At that, Dubois started down the steps, and he
tripped on the mat and fell against Hull. Hull stood
with his back to the railing, and fell over, and Dubois
threw his arm around the post, and caught Hull by the
leg or coat, and let him down. Hull lit on his face and
hands. The last thing I saw of him was his heels on
the banister. He began calling names under the steps,
and there was quite a racket, and Dubois started to run
down. I was afraid there might be some trouble, so I
ran down, and stepped between the two, and took Dubois
away, and led him over to the barn."

This seems to have been the first difficulty between these
parties, except that two or three months prior to that
time they had had some words, in which it was claimed
by Dubois that respondent had abused his dog.

It appears that, after Beatty had led Dubois to the
barn, Johnson and Jones went down the steps, and
assisted the respondent to get up, when, as Johnson
claims, respondent took a revolver from his pocket and
exhibited it to Johnson, saying, "If Dubois bothers me,
I will do him up." The respondent returned to the bar-
room, followed by the witnesses Beatty, Johnson, and
Jones. He there requested a drink, but was refused by
Mr. Beatty. Being refused, he told Mr. Beatty that he

would not pay the debt, and he could not have the chickens, and said he would go home. He started out of the door leading upon this porch, and passed in the rear of the hotel eastward, towards his home. Mr. Beatty says that, a few minutes after, Dubois came in at the side way, sat down a few minutes by the fire, and then got up and went into the kitchen; that, shortly after, he heard somebody halloo, looked out, and saw the respondent standing north of the hotel; that, a few minutes after, Dubois came out through the back gate in the beaten path that leads to the barn, and when he got just past the respondent he turned, quickened his pace, and went towards him; that Hull made some remark which he could not hear, but Dubois did not stop, and, when within probably 10 feet, Hull fired, and he saw the sparks fly from the cigar which Dubois was smoking; that he turned round to make a remark to Jones, but, before there was much time to say anything, Dubois ran towards the respondent, who backed up until he got opposite the other porch (being the side porch of the hotel), when the second shot was fired by Hull, and Dubois fell at the respondent's feet; that the respondent backed up 20 or 30 feet before the second shot was fired, Dubois following him up. Beatty ran down the steps, and took hold of the respondent, and took the revolver away from him. Respondent went back to the saloon of the hotel, and remained there until he was turned over to the care of an officer. Mr. Beatty's testimony was corroborated in a measure by the testimony of Johnson and Jones, though they contradicted each other in a measure as to where they stood at the time the shot was fired.

The respondent testified that as he and Beatty stood talking, out upon the back porch, Dubois came to the door, and said:

"'Why in hell don't you pay your debts?' Said he always paid his debts, and wanted to know why I didn't pay mine. I told him again that I did not know that it was any of his business. Dubois stepped quickly towards me, across the veranda, and called me several names, and then went back again. When I told him I did not know it was any of his business, he jumped at me, struck me in the chest, and knocked me over the railing. He then came running down at me, and Mr. Beatty took him towards the barn."

After being in the bar-room for a time, the respondent said that, when he went out of the back door, he started for home; that he went through the lane, as it was a half a mile nearer to his home; that when he got near the red house, where Dubois lived, he heard a noise that sounded like rocks being thrown, and thought to himself that he would not have any trouble, and would go back, and come around by the road; that he started back, got in between the hotel and the barn, and saw Dubois come out of the gate in the back fence, coming towards him on a run; that he hallooed then to Mr. Beatty, as he did not want any trouble, and thought he would take him off; that, when Dubois got to within 15 or 20 feet of him, he thought of his revolver, and thought he would take it out and scare him; that he called to Dubois, and said, "I have a revolver and want you to keep away from me;" that Dubois did not stop, and he shot the revolver off into the air; that he was then running backwards, and Dubois running very fast after him, and, overtaking him, Dubois struck him, knocking him down, and was on top of him when he (the respondent) fired the last shot. Respondent says:

"I don't know, and I can't say, whether I shot it on purpose, or whether I did not; but I suppose I did. I was very much excited, and don't know how the revolver went off. I was lying there, and he was on top of me and pounding me, and all of a sudden I felt him grow

limp, and knew that something had happened. I shoved him off of me, and Beatty came up, and I gave him my revolver. I did it because I had to protect myself."

The theory of the defense upon the trial was that those in the hotel, having seen the trouble between Dubois and the respondent, by which Hull was either accidentally or intentionally pushed over the railing by Dubois, and knowing that Hull was afraid of Dubois, had got one of their number to throw something after him to frighten him back, and when he was coming back they told Dubois that he was coming back, and going to do him up. There was no direct evidence given of this upon the trial, and nothing to show upon this record this fact, except, as defendant's counsel claims, from the circumstances which are to be gathered from the facts proven, and the talk of the parties there that evening.

It appears upon the examination of Mrs. Dubois, the wife of the deceased, that Dubois, after returning from the barn, where Beatty had taken him after his conflict with Hull, came into the kitchen, and armed himself with a poker and a club, and said that he had put Hull over the railing, that he had never done anybody a dirty trick, and he was not going to be done up. When he left the kitchen, Mrs. Dubois says he took the poker, but did not say what for. This was an iron poker with a wooden handle. She says that he was gone out for a few minutes, when he came in again, and threw the poker down, and again went out of the kitchen; that this was the last time she saw Mr. Dubois alive.

Mrs. Beatty was also called, and testified that she was in the kitchen when Mr. Dubois came in, and said that he would allow no man to do him up, and called Mr. Hull a bad name, and said that he threw him over the railing, and said, "I fixed him;" that the witness asked him how it was, and he shook his head, closed his lips,

and said, "Never mind; I fixed him;" that he then went around by the stove, got the poker, and went towards the door, and just before he opened the door he shoved the poker under his right sleeve, then opened the door, and went out; that she called Mrs. Dubois' attention to it. After Dubois had left the kitchen, Mrs. Beatty went up-stairs, when she heard Dubois come in, and drop the poker and the club on the table. The poker and the club were afterwards found upon the kitchen table.

The respondent testified, also, that his face was a mass of bruises and scratches which he got from Dubois while he was on top of him, and before the second shot was fired. There was evidence given upon the trial tending to show that when he arrived at the jail his face was scratched and bruised. There was also evidence on the part of the prosecution, in rebuttal of this, tending to show that at the time he was taken from the Highland Park House by the officer there were no scratches or bruises on his face, and that the scratches looked as if they might have been made with the fingers. There were two scratches three or four inches long, and about an inch apart.

The evidence also tended to show that the deceased was a violent and dangerous man, but all of the witnesses who testified to this also state that they never communicated this fact to the respondent. The prosecution gave evidence tending to show that the deceased was not a dangerous and violent character. The respondent also introduced evidence showing his good character prior to the time of the homicide. The prosecution also gave some testimony to show that after the first affray between the respondent and Dubois, by which respondent was thrown over the railing of the porch, respondent came into the bar-room of the hotel, and in a sportive manner

struck one or two of the parties there with his hat. The physician who made the *post mortem* examination of Dubois testified to the direction the ball took in passing through his head; that its direction was upward from the point where it entered the face.

Shortly stated, these are the main facts and circumstances surrounding the transactions there that night by which Dubois came to his death, and from which respondent's counsel claims that, if any offense was committed by the respondent, it could be no higher degree than manslaughter.

Felonious homicide is divided by our statute into three degrees,—murder in the first degree, murder in the second degree, and manslaughter. How. Stat. chap. 317. All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, or burglary, shall be deemed murder of the first degree. All other kinds of murder shall be deemed murder of the second degree. The statute does not attempt to define the offense, but leaves the definition as it stood at the common law.

The court charged the jury that—

"Murder is defined as where a person of sound memory and discretion willfully and unlawfully and unreasonably kills any creature in being, against the peace of the State, with malice aforethought, express or implied. Under the statutes of this State, all murders which shall be perpetrated by means of poison, or lying in wait, or any other means of unlawful, deliberate, and premeditated killing, or which shall be committed in the perpetration of any arson, rape, robbery, or burglary, shall be deemed murder in the first degree. All other murders shall be deemed murder in the second degree. If one, without cause, inflicts a wrong upon another, we call him 'wicked and malicious.' So, when one, without any legal provo-

cation, justification, or excuse, intentionally kills another, he is called a 'murderer.' The law implies from such unprovoked, unjustifiable, or inexcusable killing the existence of that wicked disposition which the law terms 'malice aforethought.' Thus, if the respondent intentionally killed Mr. Dubois without provocation, justification, or excuse, your verdict should be, 'Guilty of murder.' The intention may be inferred from the use of the deadly weapon in such a manner that the death of the person assaulted would be the inevitable consequence. If you come to the conclusion that the respondent is guilty of murder, it will be your duty to determine whether he is guilty of murder in the first or second degree. Our statute provides, as I have stated, that all murders which shall be perpetrated by means of poison or lying in wait, or any other kind of unlawful or premeditated murder, shall be murder in the first degree. In order to convict the respondent of murder in the first degree, you must be satisfied that he intended to kill Dubois, and that the killing was willful, deliberate, and premeditated."

The court further stated in that connection:

"It is not necessary that any particular time should have elapsed between the forming of the purpose and the intention to kill, and the killing. If the respondent had, previous to the shooting of Dubois, determined to kill him, and, to carry out his determination, willfully and deliberately killed him, he would be guilty of murder in the first degree. If the killing was done under a sudden impulse, then respondent would be guilty of murder in the second degree. If you are not satisfied beyond a reasonable doubt that the killing was murder in the first degree, your verdict should be, 'Guilty of murder in the second degree,' if you find him guilty of murder at all. If a man kill another suddenly, and without provocation, the law implies malice, and it is murder. If the provocation was such as must have greatly provoked him, the killing would be manslaughter only. The instrument with which the killing was done must be taken into consideration. If inflicted with a deadly weapon, the provocation must be great, to make it manslaughter. The amount of resentment must bear a reasonable proportion to the provocation, to reduce the offense to manslaughter. To make it manslaughter, it is also necessary that the killing be done immediately upon the happening of the

provocation.  If sufficient time elapses for passion to sub-side and reason to interpose, the killing is deliberate, and the crime murder, no matter how great the provocation. Under the information in this case, the respondent may be convicted of murder in the first degree, of murder in the second degree, or manslaughter, or acquitted upon the grounds that the killing was justifiable, depending upon your view of the testimony."

These are all the instructions which the court gave to the jury by which they might be guided in their deter-mination as to whether the offense committed was murder in the first degree, in the second degree, or man-slaughter.

The claim of the people, as shown by the testimony introduced upon the trial, certainly justified this charge; and we think it a very full and fair exposition of the law upon the state of facts as presented and claimed by the people.  The different degrees of the offense charged in the information are fairly distinguished; and the court, under the circumstances, was warranted in leaving the question to the jury to determine the degree of the crime; and, if the jury believed that the killing was will-ful, deliberate, and premeditated, they were justified, under the circumstances and charge of the court, in so finding.  The court carefully guarded the rights of the respondent under his claim and theory of the case.

The court charged the jury upon the question of justi-fiable homicide as follows:

"Now, gentlemen of the jury, it is for you to say whether this respondent was assaulted in the manner claimed.  The law gives to every person the right to protect themselves from unlawful assault.  Where an assault is made, the right to resist exists; but the resistance must be in proportion to the danger which is apprehended.  It is not every assault that would justify a person in resisting by using a deadly weapon.  If, however, the person assailed honestly believes his life in danger, or that he may suffer serious bodily harm, he

has the right to resist, even to taking the life of his
assailant. The person assailed is to 'be judged by the
circumstances and conditions as they honestly appeared
to him at the time. The defense of self-defense neces-
sarily assumes an assault. There can be no self-defense
by a person until he is assailed by another. It is for
you to say, from all the evidence in this cause, whether
the respondent honestly believed he was in danger of
losing his life, or in danger of great bodily harm, and
that it was necessary for him to fire this fatal shot in
order to save himself from such apparent and threatened
danger. Although you may not be satisfied that the
respondent, in committing the act, acted in self-defense,
still, if the testimony in this case creates in your mind
a reasonable doubt as to whether or not the act was
done in self-defense, the respondent is entitled to the
benefit of the doubt, and it will be your duty to acquit
him."

This was a correct statement of the law.

From a careful reading of the record, we are satisfied,
however, that certain proceedings took place upon the
trial which had the tendency to prejudice the rights of
the respondent, and that he has not had that fair and
impartial trial to which he is entitled, and we are further
satisfied that the court was in error in certain portions
of his charge when referring to the respondent, and his
claim of injuries received at the hands of Dubois.

It appeared that when Mr. Beatty, the principal wit-
ness in the case for the prosecution, was upon the stand,
and was being cross-examined by respondent's counsel, he
was asked if a certain man by the name of Jones was
there at the hotel, and also a colored man; and the wit-
ness testified that they were there. He was then asked:

"*Q.* When Hull started out to go home, did these men
go out immediately afterwards?

"*A.* I think they did.

"*Q.* How long were they gone before .they came back
in?

"*A.* I remember them coming back. They were gone,
probably, about five minutes.

"*Q.* Did they come back into the saloon, and say, 'Hull is coming back?' [This was objected to, but permitted to be asked, and the witness answered.] ·

"*A.* I don't remember whether they made that remark or not.

"*Q.* Did they say they had thrown something at him, or in front of him, to turn him back, when they came back in there? [This was objected to and excluded.]"

The court thereupon commenced the examination of the witness himself, and asked:

"*Q.* Were you examined by the magistrate below?

"*A.* Yes, sir.

"*Q.* Have you talked with any one since that examination with reference to the facts in this case?

"*A.* Oh, yes; it was the talk of the hotel for a few days after that.

"*Q.* Have you talked with any one since that examination with reference to the testimony you were to give on this trial?

"*A.* No, sir.

"*Q.* Will you read the first 8 pages of your examination, as returned by the magistrate? I want to ask you a few questions."

Hereupon the witness took the magistrate's return, and read the first eight pages of his examination to himself, but not aloud, as directed by the court; after which the court continued as follows:

"*The Court:* I call your attention to what took place. Will you go on and state the conversation that you had with Mr. Hull, the respondent, before you went out on the verandah, as near as you can recollect it?

"*Respondent's Counsel:* We object to that. That is what your honor excluded before.

"*Court:* I said that time that we wanted all the facts, and everything that took place there.

'*Respondent's Counsel:* In addition to that, I make an objection to what appears to be the intention of the examination by the court.

"*Court:* I suppose I have the right to examine the witness for the purpose of ascertaining the proof.

"*Respondent's Counsel:* Yes, your honor.

"*Court:* That is all I want. I want all the facts in this case, and that is what I shall try to ascertain in this case, as in all cases.

"*Respondent's Counsel:* There is nobody wishes your honor more success than I do; but it seems to me that your honor has taken a tone or manner which is hostile to the respondent, and I desire an exception to that. As to the research as to the facts, I have no objection.

"*Court:* If it is because the facts may be prejudicial to you, if they came out—

"*Respondent's Counsel:* · I desire an exception to that remark.

"*Court:* I don't know as I can change my manner to suit you. I ask these questions, and want the facts; that is all. If you could photograph it, it might bear the interpretation that you put upon it. I don't know."

Thereupon follows six pages of examination by the court of the witness Beatty, in which he went over with the witness, by question and answer, what took place between the respondent and Dubois upon the porch; of respondent's starting for home, and his return; the meeting between Dubois and the respondent, up to and including the time when the shooting took place.

We think this examination by the court, and the remarks of the court that the objection of counsel was made because the facts would be prejudicial to his client, had the tendency to prejudice the rights of the respondent, and convey to the jury the idea that, if the facts were drawn out as the court proposed to draw them out, such facts would be injurious to the respondent's case. The case was a peculiar one in many of its details, and the court could not be too careful in the conduct of the examination to conceal from the jury his views as to the importance and bearing of the testimony tending to establish the guilt of the respondent.

Some complaint is also made by respondent's counsel that the court improperly limited his cross-examination of the people's witnesses. We think the respondent,

under the circumstances, should have had a full and fair
opportunity of cross-examination under his theory of the
case, and that to a certain extent the court did put
restrictions upon the cross-examination. As we have
said before, it was the theory of the defense that those
in the hotel, knowing that Hull was afraid of Dubois,
had got one of their number to run after Hull, or throw
something after him, to frighten him back, and, when
he was seen coming back, they told Dubois that he was
coming back to do him up. Respondent's counsel sought
to draw out of the witnesses Johnson and Jones, who
were introduced by the people, that something of this
kind was said. This was excluded by the court. We
think the court should have permitted the respondent to
show all that took place, and all that was said and done
in the hotel by Johnson and Jones, as well as Beatty
and Dubois, after the respondent had left the hotel, and
before his return there, at the time the shooting took
place; and that the court should have permitted
respondent's counsel to show the whereabouts of Dubois,
as well as of Beatty, Jones, and Johnson, during that
time, as there appears to be great conflict in the testi-
mony of Jones and Johnson as to where they were, and
where Dubois was, during that time.

We think the court was also in error in stating to the
jury in his general charge:

"If the respondent had been knocked over the railing
of the porch as claimed, and struck upon his head and
face, would not the fall have injured him, or left some
soreness about the head and shoulders, indicating a fall
in the manner claimed by respondent? On the other
hand, if, as Beatty supposed, it was accidental, and
Dubois grabbed Hull by the legs, letting him down
easily, and thus breaking the fall, does the absence of
soreness about the head and shoulders tend to sustain
the testimony of Beatty as to how it actually occurred?"

This part of the charge was argumentative, and must have tended strongly to impress the jury that, inasmuch as there was no soreness about the head and face of the respondent, the court was of the opinion that Dubois knocked Hull over the railing by accident, and that Hull had not testified truthfully when he claimed that Dubois struck him in the breast and intentionally knocked him over. He may or he may not have received such injuries by being knocked over as to cause soreness about his head; and the fact that there was no soreness might not in the least degree tend to show whether Hull was or was not telling the truth when he said that Dubois struck him in the breast and knocked him over.

The court also charged the jury as to the scratches upon the face of the respondent as follows:

"Now, if there were scratches upon his face as claimed, were they received at the hand of the deceased, or did the respondent with his own hand, after the shooting, and on his way to the jail, or as he was entering the jail, make those marks on his face?"

The evidence tended to show, and it was claimed by the respondent, that his face bore evidence of the scratches and bruises inflicted by the deceased at the time the shot was fired. Mrs. Littlefield testified that, when respondent was brought to the jail the night of the shooting, she saw the scratches on his face. Dr. Mulheron testified to some scratches on his face. Mr. Carmichael, the reporter who interviewed him at the jail, says he saw scratches on his face that appeared as if they had been made with the fingers. On the other hand, the constable and Mr. Raupp, who accompanied him to the jail, testify that there were no marks upon his face at that time. But we think the court, under this evidence, had no right to say to the jury that they could find that the respondent made these marks upon his own

face on his way to the jail, in view of the testimony given by the constable and Mr. Raupp that on the way to the jail he did not meet with any accident.

One other very serious objection is also raised by respondent's counsel upon this record. It appears that, after the evidence had closed in the case, the court directed that the jury should view the premises where the homicide was committed. The jury were accordingly taken out to the premises; the circuit judge, reporter, deputy sheriff, prosecuting attorney, respondent's counsel, and several of the representatives of the daily press accompanying them. During this time the respondent was confined in the jail. On the return of the judge and jurors the court proceeded to charge the jury. It is now contended by counsel for respondent:

1. That the court erred in taking the jury out to view the premises in the absence of the respondent.

2. That the court erred in not keeping the jury together under the supervision of the court, or an officer of the court, while said view was being had.

3. That the court erred in not taking measures to prevent the jury from drinking spirituous liquors while that view was being had.

It is admitted upon the record that the view of the premises was taken in the absence of respondent; that the jury were not kept together during that view, under the supervision of the court, or an officer of the court; and it appears by the affidavit of Mr. Hawley, respondent's counsel, and is not contradicted, that one of the jurors drank whisky at the bar of the hotel while they were viewing the premises.

How. Stat. § 9569, provides that—

"The court may order a view by any jury impaneled to try a criminal case, whenever such court shall deem such view necessary."

86 MICH.—30.

The court was not in error in permitting or directing a view of the premises by the jury; but we think it was the duty of the court, in the absence of the respondent, to have kept the jury while on their way to, and on their return from, and in their view of, the premises, under the supervision of an officer, so that no person might communicate with them, or express any opinion or give any directions in their hearing;. for anything which took place which was in the nature of testimony certainly.could not be given to the jury in the absence of the respondent.

We think, also, that the juror was guilty of misconduct in drinking liquor upon the premises while he was in the line of his duty as a juror, under the direction of the court, to view the premises. It does not appear by the record who furnished this liquor, but it was procured in the very room and at the same bar where all the trouble had arisen between Dubois and the respondent. Whether the liquor was furnished by Beatty, the principal witness for the prosecution, does not appear; but it does appear that it was procured at the house of Beatty, where the tragedy occurred. We think this such misconduct that for this reason the case should be reversed, and a new trial ordered. The reversal, however, is not based upon this error alone, but also upon the other errors which we have pointed out.

We are unable to say upon this record that there were no facts shown, or circumstances, as claimed by respondent's counsel, which would warrant the court in submitting to the jury the question whether the respondent was guilty of murder in the first degree. Had it appeared upon the trial that respondent knew or had been advised that Dubois armed himself with a poker or club, and had made threats to fix him, or that the respondent knew

Dubois to be a violent and dangerous man, it might be claimed, even upon the people's theory, that the respondent did not act with deliberation in firing at Dubois, and that there was no premeditation before the fatal shot was fired.   The record does not disclose, although respondent's counsel sought to draw it out upon the cross-examination of Jones and Johnson, that either of those parties or Dubois headed the respondent off at the red house when he started to go home.   As the record appears now, we are unable to say that the court should not have submitted the question as to the guilt or innocence of the respondent of murder in the first degree. For the reasons pointed out, however, the verdict must be set aside, and a new trial ordered.[1]

MORSE and McGRATH, JJ., concurred with LONG, J.

CHAMPLIN, C. J.   I concur in reversal on the ground that the court permitted the jury·to view the premises unattended, and the misconduct of the jury.

GRANT, J.   I concur in the result.

---

[1] On July 29, 1891, Mr. Justice LONG, to whom an application had been made to admit respondent to bail, after taking the advice of the other Justices, granted the application, fixing the bail at $5,000.