*In re* QUINN'S ESTATE.

McCARTNEY *v.* SAUL.

1. TRIAL—JURY—ENTERTAINMENT OF JUROR BY ATTORNEY—PREJU-
DICIAL ERROR—ATTORNEY AND CLIENT—MISCONDUCT.

Where one of the jurors at the trial of a hotly contested
will case was entertained at the house of the attorney
for the prevailing party on Thanksgiving day, during the
progress of the trial, among the members of a club which
had been invited before the trial, and the attorney sub-
sequently retired from participation in the case, but acted
as a witness, and the court had warned the jurors not
to talk with the parties or their attorneys, it was erroneous
to deny proponent's motion for a new trial on the ground
of prejudicial influence.

2. SAME—NEW TRIAL—GROUNDS.

Without reference to the question of the correctness of
the verdict, a new trial will, in most cases, be ordered,
where a juror has been fed or entertained by the success-
ful party or his counsel during the progress of the
trial.[1]

3. EVIDENCE—WITNESSES—ATTORNEYS—CROSS-EXAMINATION.

On the trial of a contest over decedent's will, which con-
testants claimed was void for incompetency of the
testatrix, an attorney for the contestants who had given
testimony tending to show the mental and physical con-
dition of the testatrix at times when he called upon her
in relation to a certain proposed compromise of pending
or threatened litigation, should have been permitted to
answer, on cross-examination, what was his purpose in
making the visit and whether he was there at another
time.

4. WILLS—EVIDENCE—EXTENT OF CROSS-EXAMINATION.

In the trial of a contested will case it was improper to
exclude cross-examination of the attorney for contestants
which was offered to show decedent's motive for changing
her will to the disadvantage of the contestants, because
they threatened to commence certain litigation.

[1] On the question of treating jurors as ground for new trial,
see note in 19 L. R. A. (N. S.) 733.

Error to Shiawassee; Miner, J. Submitted January 27, 1914. (Docket No. 89.) Decided June 1, 1914.

Margaret McCartney and others presented for probate the will of Bridget Quinn, deceased, which was admitted to probate in the probate court and contestant Margaret Saul appealed to the circuit court. Judgment for contestants and proponents bring error. Reversed.

*Neil R. Walsh* and *Edwin H. Lyon*, for appellants.
*A. L. Chandler* and *George E. Pardee (John T. McCurdy*, of counsel), for appellees.

STEERE, J. The writ of error herein brings before the court for review proceedings had in the circuit court of Shiawassee county in contesting the validity of the will of Bridget Quinn, who died in the city of Owosso November 28, 1911, at the age of 84 years, leaving an instrument as her last will and testament, executed November 16, 1911. Said instrument was duly probated in the probate court for Shiawassee county, and contestant Margaret Saul, a sister of deceased, appealed to the circuit court, where trial by jury was had resulting in verdict and judgment sustaining her contention and adjudicating said instrument invalid. The validity of said instrument was contested on the grounds that, at the time of its execution, deceased was "mentally incompetent to make the will, and was unduly influenced and coerced to sign (if she did so sign) said alleged will."

The amount of deceased's estate is not definitely disclosed, but sufficient appears in the record to indicate it was of considerable proportions and adequate to develop a bitter and exhausting contest over it amongst her numerous surviving relatives. By the terms of the instrument in controversy, which contained 14 bequests and devises, she gave an adopted

son named W. W. Quinn, of Battle Creek, certain real estate in Owosso; to two nieces, Mrs. McCartney and Mrs. Cunningham, certain real estate in Owosso, with a proviso that the latter, upon payment to her of $1,000, should deed her interest therein to the former, and to the same parties also other described real estate with her household effects; to a young woman, Esther Lyke, who had lived with her many years, $200; to two of her nephews, and her four brothers and sisters, including said contestant Margaret Saul, $5 each; $30 for five low masses for certain named relatives; and the balance of her estate in trust to Frank McCartney, husband of a niece, to be used for the benefit of the Catholic schools of Owosso. She had made two previous wills of similar import, but designating different executors; the second will having been executed May 20, 1911, about six months prior to the one in question.

The scrivener, a reputable attorney of Owosso, who drafted those wills and also the one in question, testified that he had no knowledge of what property she owned, or of the relatives whom she made objects of her charity, other than that shown by the wills; that he received suggestions for their contents only from her, and the occasion of the last one was her desire to make some changes relative to disposition of the residue of her estate and the amount given to certain beneficiaries, one of which was a reduction of the bequest to Margaret Saul, the contestant. Said attorney, who was later one of the attorneys for proponents, and deceased's family physician were the subscribing witnesses, and both testified that, at the time of the execution of her will on November 16, 1911, her mental condition was good; that in their opinion she was capable of understanding the provisions of the will, knew what property she possessed and who were the objects of her bounty. Various relatives and other witnesses also testified that she

was then possessed of all her faculties, of good understanding, bright, and mentally sound.

To the contrary it was claimed, and testimony was produced tending to show, that she was then hopelessly of weak and unsound mind, childish, forgetful, possessed of hallucinations, incoherent in her talk, and often during that summer and fall lapsed into a comatose condition from which it was difficult to arouse her, and that she was mentally incapable of understanding or executing the instrument in question, or any other matter of importance and was hopelessly stricken with arterio sclerosis, which an expert, of 13 years' general practice of medicine, defines as a hardening of the arteries, usually expected to be found in people above 60 years of age, progressive in its nature, and by reason of which, in his opinion, the average person of 70 years of age would be partially incompetent to make a will, and would require some assistance "to get it clear, concise, and make it legal" (although a less degree of mental capacity is requisite for the execution of a will than for making a contract). Upon this paramount issue of deceased's mental capacity when the instrument in question was executed, as well as that of undue influence exerted over her by certain relatives, a volume of testimony of wide scope was introduced, professional and non-professional, covering her life habits and history, ranging through her likes and dislikes, pursuits, associations, quarrels, language, appearance, and state of health, as well as her mental and physical condition at or about the time of executing the contested will. For the present disposition of this case it is not deemed essential to consider this voluminous testimony at length upon all the many questions raised by the numerous alleged errors assigned by appellants.

When trial of this case was entered upon, after the jury was selected and sworn, the court, in the presence of counsel, very properly took pains to instruct

the jury in a preliminary way as to their duties and deportment during the progress of the trial, cautioning them to avoid any conduct which might possibly give rise to suspicion of outside influence, saying, amongst other things:

"This is a case of interest to both parties, and both parties have a right to a fair and impartial verdict at your hands, and so, in order to accomplish that, I desire you to be careful and not talk with any one, witnesses or attorneys, who have anything to do with this case," etc.

Under this very proper rule of conduct, so clearly stated, and in view of the rather unusual and delicate situation which presented itself in the particular that three of the attorneys in the case were also important witnesses, one for proponents and two for contestant, testifying positively and at length in favor of their respective clients upon the controlling issue of deceased's mental competency, we are impressed that the following circumstance of familiar intercourse in violation of the mandate of the court should not be lightly disregarded. It was shown that a juror who sat in the case was, during the progress of the trial, entertained at the home of one of the witnesses and attorney of record for the successful litigant, inadvertently and innocently it is claimed, and may be conceded, but nevertheless an undisputed fact. This was learned by appellant's counsel after the trial was concluded and presented to the court by affidavits, as one of the grounds of a motion for a new trial. Counter affidavits were filed, not denying the essential facts as above stated, but in explanation and extenuation of them. This case was tried in November, and, while it was in progress, Thanksgiving day intervened. On that day the attorney and his wife entertained at their home and served refreshments to the members of the Maple River Farmers' Club. The juror in question, not a member of that club but of a

kindred organization, was present on that occasion and partook of the hospitalities. It is stated in the counter showing that he was there by reason of an invitation extended to him and his wife, before commencement of the trial in question, in connection with other members of the kindred club to which the juror belonged, the invitation not having been participated in or known to the attorney; that the trial was not mentioned or in the minds of either of the parties, and no special attention or favors were shown the juror beyond the usual courtesies of hospitality extended to all present; that the attorney, though his firm was of record as attorneys in the case for contestant, had no interest in the result, had withdrawn from participation in the trial, owing to his being a witness, and had when on the witness stand so stated; that the whole transaction complained of was a mere innocent incident of ordinary hospitality which had its inception before it was known the guest might be a juror in the case, devoid of suspicious circumstances, was not designed to, could not, and did not, exert the slightest influence on the juror, who was a reputable farmer of strict integrity, nor bias him in performing his duties as a juror. It is also shown, and urged by appellants as directly prejudicial, that on the occasion of this social function, in a general discussion of the welfare of the Maple River Club, the attorney emphasized his kindly disposition towards such organizations by stating that, if the club felt too poor to pay the State dues of 20 cents per family, he would pay them while he lived, and arrange in his will for them to be paid as long as the club existed, and, in response to an expression by the juror or "wonder" if he would make such a promise to his club, made some facetious reply indicating a friendly inclination, hampered by the results of a recent campaign. It is urged that "no man, be he ever so honest, could feel otherwise than touched by the munificent

offer" to pay the dues for those who were or felt too poor to pay them and to perpetuate such payments by will after the donor had joined the silent majority, followed by expressions of regret that his limit of financial resources only prevented extending the aid to other kindred organizations.

It was the opinion of the trial court that sufficient facts were not shown to demand granting a new trial, referring to the high character and integrity of the parties involved, and the fact that, after the selection of a jury, the attorney withdrew and took no further part in the trial of the case except as a witness.

Conceding that the juror knew or believed that the attorney had retired as such from the case and was not interested in the result, he yet knew that the attorney was a witness and that the court had emphatically instructed the jurors not to even "converse with any one connected with the trial of the case," saying, "That means the witnesses, the parties, and the attorneys."

It is undisputed that the juror violated the plain and positive instructions of the court, thus giving occasion for the imputations which he was cautioned to avoid, and affording special opportunity for the exercise over him of improper influences, was either party so disposed. The gracious hospitality and pleasant entertainment extended on that occasion to the juror and other guests, by the host and hostess in their own home, with congenial conversation on a subject in which the juror was interested, disclosing on the part of the host a generosity and good will towards organizations with which the juror was affiliated, would naturally give rise to an especially kindly and fraternal feeling between them. Just to what extent the attorney was connected with the case is not the controlling question. He was an important witness. The record shows that he was present at the beginning of the trial, sat by and consulted with

attorneys for contestant until half an hour after the jury was selected, and while on the witness stand testified on cross-examination that his firm was employed by contestant. The juror whom he helped select, and whom he entertained as an invited guest at his home during the progress of the trial, unknown to opposing counsel, participated in a verdict in this case supported by his testimony and favorable to his firm. On this question it is not necessary that it be shown a bad motive or intent existed in the conduct of counsel or juror, or that the impropriety complained of did in fact exert an influence resulting unfavorably to the party defeated.

As was said in *Solomon* v. *Loud,* 173 Mich. 233 (140 N. W. 651):

"The effect of the misconduct upon the determination of the particular case is not apparent. But when misconduct, calculated, if not intended, to have a generally pernicious effect upon legal proceedings, is traceable to the prevailing party in such proceedings, we are of opinion that reason appears for treating the trial as a mistrial and for setting aside the judgment."

In 2 Thompson on Trials, § 2564, it is said:

"Where a juror has been treated, fed, or entertained by the successful party, or his counsel, or at the expense of either, a new trial will, in nearly all cases, be granted. This rule is, by most courts, deemed indispensably necessary to preserve the integrity of juries. It being, as already stated, a rule of public policy, it will be enforced without reference to the question whether or not the verdict was right."

This general rule is further sustained and elaborated by apt language in *People* v. *Montague,* 71 Mich. 447 (39 N. W. 585); *Churchill* v. *Alpena Circuit Judge,* 56 Mich. 536 (23 N. W. 211); *People* v. *Hull,* 86 Mich. 449 (49 N. W. 288); *Cooper* v. *Carr,* 161 Mich. 405 (126 N. W. 468); *State* v. *Hartmann,* 46 Wis. 248 (50 N. W. 193); *Knight* v. *Inhabitants*

*of Freeport,* 13 Mass. 218; *Commonwealth* v. *Roby,* 12 Pick. (Mass.) 496.

We are impelled to conclude that the conduct complained of, though perhaps inadvertent, is of such a nature as to require the application of that rule.

Another assignment of error calling for serious consideration is the refusal of the court to permit answers to certain questions asked in cross-examination of one of contestant's attorneys, who was also an important witness to facts bearing on deceased's mental competency. He testified to having visited deceased's home on three different occasions during the month the will in controversy is claimed to have been executed, at which times he saw but was unable to converse with her owing to her condition; that on the first occasion she was lying on a couch with her eyes closed, and Margaret McCartney, who was apparently in charge of the household, was unable to arouse her, although she took hold of and shook her, without any apparent effect; that on the two subsequent visits her physical and mental condition were apparently the same; that witness observed her lower jaw somewhat dropped, muscles of her face apparently relaxed, her complexion of extreme pallor, "and with every appearance of a person knowing nothing of her surroundings." Objection was sustained to the following questions asked by appellants' counsel:

"*Q.* At that time [referring to the second visit] you went there for the purpose, did you not, of making a demand for retraction of an alleged slander by Mrs. Quinn, and for the purpose of securing from her a money settlement?

"*Q.* Did you not go to the house of Bridget Quinn after this occasion that you talked with Dr. Willson, on business matters, in relation to a suit you proposed to start against Mrs. Quinn?"

The witness should have been permitted to answer these questions. The fact that witness visited her to

negotiate in regard to an important business matter relating to a proposed lawsuit, and contemplated settlement involving a substantial sum of money, and having on the first visit ascertained her condition, as testified to, returned a second and third time on the same mission, was clearly competent as bearing on the weight of his testimony touching her mental condition.

The competency and bearing of this inquiry is more clearly disclosed, we think, in connection with a later ruling, refusing counsel permission to show by Margaret McCartney more fully what was said and done on the occasion of such visits. Counsel for proponents, after an adverse ruling, being permitted to state privately the purpose of the proposed testimony, said:

"We expect to show by this witness that Mr. Pardee, representing the McNamaras, called there and told the witness that he represented the McNamaras in a proposed slander suit, and that Mrs. Saul was their witness in that respect to prove the fact; that upon all of the visits he made there it was for the same purpose, and the facts communicated by Mr. Pardee to Mrs. McCartney were communicated by her to Mrs. Quinn, and it had the effect of showing her that Mrs. Saul was taking steps adverse to Mrs. Quinn desiring to collect the sum of $500 in said slander action, and therefore was made the basis for the change in the will which was subsequently made."

We think, under the circumstances disclosed, full latitude should have been given to the proposed line of cross-examination of the attorney, and that, as bearing upon deceased's mental attitude and reason for changing her will, the offered testimony of Mrs. McCartney was competent.

For the reasons stated, the judgment must be reversed, and a new trial granted.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.