PEOPLE v MALLORY

PEOPLE v HOWARD

PEOPLE v LEWIS

Docket Nos. 64270, 65203, 65206. Argued June 8, 1983 (Calendar Nos. 8–10).—Decided December 28, 1984. Released February 1, 1985. Rehearings denied 422 Mich 1201.

Bobby Mallory, Charles E. Howard, and Hughie V. Lewis were jointly tried and convicted by a jury in the Recorder's Court of Detroit, Joseph A. Gillis, J., of first-degree felony murder. The Court of Appeals, N. J. Kaufman, P.J., and D. C. Riley and Theiler, JJ., in an unpublished opinion per curiam in *Mallory* (Docket No. 78-2377), and N. J. Kaufman, P.J., and D. E. Holbrook, Jr., and R. M. Maher, JJ., in a published opinion per curiam in *Lewis* and *Howard* (Docket Nos. 78-2959, 43838), affirmed. The defendants appeal, alleging that they were unlawfully detained by the police under "reverse writs" and that evidence of shoes seized from Mallory during that detention and the results of blood tests performed on the shoes and an incriminating statement by Howard should not have been admitted, that they were denied their right to be present at a jury view of the scene of the crime, and that evidence that the victim had terminal brain cancer should not have been admitted.

In an opinion by Justice Cavanagh, joined by Chief Justice Williams and Justices Kavanagh and Levin, the Supreme Court *held:*

Evidence obtained during a statutorily unlawful detention, such as a detention under a "reverse writ," may not be admitted during trial where the detention was employed as a tool to

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4, 6] 5 Am Jur 2d, Arrest § 22.

29 Am Jur 2d, Evidence §§ 412, 414.

[1, 2, 4, 6, 7] 21 Am Jur 2d, Criminal Law §§ 408, 412.

[3] 39 Am Jur 2d, Habeas Corpus § 1.

[5, 9-11] 21A Am Jur 2d, Criminal Law §§ 692 *et seq.,* 695, 915.

[6, 8] 29 Am Jur 2d, Evidence § 292.

[8] 8 Am Jur 2d, Bail and Recognizance § 50 *et seq.*

directly procure any type of evidence from a defendant; nor may any other evidence be admitted that would not have been discovered but for the direct procurement. If the defendants are retried, evidence obtained as a result of the reverse writ detentions and evidence that the victim had terminal brain cancer is inadmissible. In addition, the defendants are entitled to be present at any jury view ordered by the trial court.

1. The "reverse writ," whereby a defendant underwent a habeas corpus proceeding in the Recorder's Court of Detroit and was subjected by adjournment of the proceeding to judicially approved detention before being arraigned on proper complaints and warrants was without legal effect and a nullity, having no constitutional or statutory basis. Failure to bring a person arrested for a felony without a warrant promptly before a magistrate for arraignment violates the person's state and federal due process rights and rights afforded by the Code of Criminal Procedure. Case law has imposed exclusion of evidence as a remedy where statutorily unlawful detentions have been employed as tools to extract statements by defendants. The remedy is appropriate where, as in this case, such a detention has been employed to procure directly *any* evidence from the person detained and extends to any other evidence that would not have been discovered but for that procurement. In this case the detention of the defendants on reverse writs was employed as a device to generally marshal evidence against them. Thus, evidence of shoes seized from Mallory during the detention and associated blood tests was inadmissible. Likewise, Howard's statement incriminating himself made during the detention was inadmissible. Such evidence would also be inadmissible upon retrial.

2. Not all evidence acquired directly or indirectly from a defendant during a statutorily unlawful detention is necessarily procured by exploiting the detention. Voluntary statements made shortly after a lawful arrest, inadvertent discovery, absent a general plan or pattern to marshal evidence against the defendant, of physical evidence in the defendant's possession or among his personal effects, or evidence obtained by means sufficiently distinguishable to be purged of the taint of unlawful detention are admissible.

3. A criminal defendant has a statutory right to be personally present during trial, including voir dire, selection of and challenges to the jury, presentation of evidence, summation of counsel, instruction of the jury, rendition of the verdict, imposition of sentence, and any other stage of trial where his substantial rights might be adversely affected. A jury view is such a

stage of a trial. Absent a waiver of the right to be present or loss of the right because of disorderly or disruptive conduct during trial, a defendant has a right to be present at a jury view.

4. Testimony that the victim had terminal brain cancer was not relevant to a prosecution of first-degree murder and should not have been admitted. Its only purpose was to appeal to the sympathy of the jury.

Reversed and remanded.

Justice Boyle dissented.

1. Although there was no lawful authority for the "reverse writ" detention of the defendants, the real issue is whether, regardless of the writ, a 72-hour delay in the arraignment of the defendants following an arrest based on probable cause requires suppression of Howard's statement and evidence of Mallory's shoes and the blood tests performed on them which were obtained during the period of unlawful detention. Because there was probable cause to arrest the defendants, because their detention was not used as a tool to extract Howard's statement, and because Mallory's shoes could have been lawfully seized at the time of his arrest, suppression of the evidence was not required. There is no federal constitutionally guaranteed right to prompt arraignment. Where the state statutory requirement of prompt arraignment is violated, exclusion of evidence is appropriate as a remedy only where the delay has been employed as a tool to extract a statement. Expansion of this rule to exclude physical evidence is not proper, nor is the conclusion that the detention was used to obtain Howard's statement and Mallory's shoes correct.

2. Failure to have an immediate hearing to set bail does not require exclusion of the evidence obtained during the defendants' detention. The defendants had no constitutional or statutory right to an immediate bail determination. They were afforded an opportunity to have bail set at the reverse writ proceeding. They were also judicially advised of their constitutional rights at the reverse writ proceeding, one of the purposes of the prompt arraignment requirement. Application of the exclusionary rule in this case on the ground that the defendants were denied their right to formal arraignment must be based on the conclusion that the right is of paramount importance to the integrity of our system of justice. Because a pretrial release determination remains subject to modification, by itself it is insufficient to make arraignment a critical stage of the proceeding. Unlike a situation in which a confession is obtained during a period of unlawful detention and would not

have existed but for the violation of the defendant's statutory rights, the physical evidence in this case existed independent of the detention.

3. Where a jury view is nothing more than a bare inspection of the scene of the crime, neither the constitution nor a statute requires a defendant's presence. The refusal to permit the defendants to be present at a jury view of the scene of the crime does not require reversal of their convictions because under the circumstances of the case any reasonable possibility of prejudice to the defendants was prevented by careful instruction of the jury, limitation of the scope of the view, and the presence of defense counsel at the view. In addition, the defendants presented no particularized statement to the court of any benefit to the defense by their presence at the view. The presence of a defendant at a jury view is not mandated by the constitution. A jury view is a view of a scene rather than evidence. Its purpose is to enable the jury to understand testimony heard in court. It is not a situation in which a defendant is confronted with evidence.

Justice Brickley, joined by Justice Ryan, concurring, stated that a jury view is part of a trial, subject to the harmless error rule. Where, as in these cases, it is highly improbable that the defendant's presence at the view could aid in his defense, any error in not permitting the defendant to be present should be deemed harmless.

97 Mich App 359; 296 NW2d 22 (1980) reversed.

### OPINION OF THE COURT

1. CRIMINAL LAW — EVIDENCE — DUE PROCESS — REVERSE WRITS.

The detention of defendants suspected of felony murder by the police under authority of reverse writs informally issued by the Recorder's Court of Detroit, but without formal arrest or arraignment, was unlawful, and because the detention was used to procure directly evidence from the defendants it rendered evidence seized from one defendant and incriminating statements made by another during the detention inadmissible (Const 1963, art 1, § 17; MCL 764.13, 764.26; MSA 28.871[1], 28.885).

2. CRIMINAL LAW — EVIDENCE — DUE PROCESS — UNLAWFUL DETENTION.

Evidence obtained during a statutorily unlawful detention, such as a detention under a "reverse writ," may not be admitted during trial where the detention was employed as a tool to directly procure any type of evidence from a defendant; nor

may any other evidence be admitted that would not have been discovered but for the direct procurement (Const 1963, art 1, § 17; MCL 764.13, 764.26; MSA 28.871[1], 28.885).

3. Habeas Corpus — Due Process — Criminal Law.

Failure to bring a person arrested for a felony without a warrant promptly before a magistrate for arraignment violates the person's state and federal due process rights and rights afforded by the Code of Criminal Procedure (Const 1963, art 1, § 17; MCL 764.13, 764.26; MSA 28.871[1], 28.885).

4. Criminal Law — Evidence — Unlawful Detention.

Not all evidence acquired directly or indirectly from a defendant during a statutorily unlawful detention is necessarily procured by exploiting the detention; voluntary statements made shortly after a lawful arrest, inadvertent discovery, absent a general plan or pattern to marshal evidence against the defendant, of physical evidence in the defendant's possession or among his personal effects, or evidence obtained by means sufficiently distinguishable to be purged of the taint of unlawful detention are admissible.

5. Criminal Law — Constitutional Law — Presence of Defendant — Jury View.

A criminal defendant has a statutory right to be present during any stage of a trial where his substantial rights might be adversely affected, including a jury view (MCL 768.3, 768.28; MSA 28.1026, 28.1051; GCR 1963, 513).

DISSENTING OPINION BY BOYLE, J.

6. Criminal Law — Evidence — Reverse Writs.

*Evidence of a statement made by a defendant and of shoes of another defendant and blood tests performed on them in a prosecution of first-degree felony murder should not have been suppressed on the ground that their detention following arrest on the authority of a "reverse writ" was unlawful where there was probable cause to arrest the defendants, the detention was not used as a tool to extract the statement, and the shoes could have been lawfully seized at the time of the arrest.*

7. Criminal Law — Evidence — Arraignment.

*Exclusion of a statement obtained during the detention of a defendant on the ground that the defendant's statutory right to prompt arraignment was violated is appropriate only where the delay was employed as a tool to extract the statement, and the rule should not be expanded to exclude physical evidence which*

*exists independent of the detention (MCL 764.13, 764.26; MSA 28.871[1], 28.885).*

8. CRIMINAL LAW — EVIDENCE — BAIL.

*Evidence of a statement made by a defendant and of shoes of another defendant and blood tests performed on them in a prosecution of first-degree felony murder should not be suppressed on the ground that the defendants were not immediately afforded an opportunity to have bail set because there is no right to such an immediate determination.*

9. CRIMINAL LAW — PRESENCE OF DEFENDANT — JURY VIEW.

*Refusal to permit the defendants in a prosecution of first-degree felony murder to be present at a jury view of the scene of the homicide does not require reversal of their convictions where under the circumstances of the case any reasonable possibility of prejudice to the defendants was prevented by careful instruction of the jury, limitation of the scope of the view, and the presence of defense counsel at the view, and the defendants presented no particularized statement to the court of any benefit to the defense by their presence at the view.*

10. CRIMINAL LAW — PRESENCE OF DEFENDANT — JURY VIEW.

*A jury view where no testimony is presented is neither evidence nor a situation in which the defendant is confronted with evidence, but is, rather, an aid to the jury in understanding evidence which has been presented in court; for purposes of the right of confrontation, it is not a part of the trial at which the defendant has the right to be present.*

OPINION BY BRICKLEY, J.

11. CRIMINAL LAW — PRESENCE OF DEFENDANT — JURY VIEW.

*A jury view is part of a trial, subject to the harmless error rule; where it is highly improbable that a defendant's presence at a view could aid in the defense, any error in not permitting the defendant to be present should be deemed harmless (MCL 768.3; MSA 28.1026).*

*Frank J. Kelley,* Attorney General, *Louis J.. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Edward Reilly Wilson,* Deputy Chief, Civil and Appeals, and *Jeffrey Caminsky,* Asistant Prosecuting Attorney, for the people.

*Charles Burke* for defendant Mallory.

*Bernstein & Rabinovitz, P.C.* (by *Steven Rabino-vitz*), for defendant Lewis.

*Kraizman & Kraizman* (by *Jack J. Kraizman*) for defendant Howard.

CAVANAGH, J. Defendants were convicted by a jury of first-degree felony murder, MCL 750.316; MSA 28.548, and were sentenced to the statutorily mandated term of life imprisonment. The Court of Appeals affirmed their convictions,[1] and we granted defendants' applications for leave to appeal.[2]

## I. FACTS

On January 12, 1978, at about 10:30 p.m., O'Dell Cheatham was beaten and stabbed in a Detroit alley. An eyewitness saw two men, whom he could identify, beating and kicking the victim near a car. That witness also saw a third man, whom he could not identify, seated in the car in the driver's position. The witness contacted the police and relayed descriptions of the assailants and of the car. Shortly thereafter, only a few blocks from the scene of the crime, police officers on routine patrol saw three men standing near an apparently disabled vehicle. At that time, defendant Howard stated to the police that the disabled vehicle was his. Within minutes, the patrol officers received a radio dispatch that three men were wanted for the felonious assault on O'Dell Cheatham. Defendants Mallory and Lewis and the disabled vehicle fit the

[1] *People v Mallory,* unpublished opinion per curiam of the Court of Appeals, decided November 26, 1979 (Docket No. 78-2377); *People v Hughie Lewis* and *People v Howard,* 97 Mich App 359; 296 NW2d 22 (1980).

[2] *People v Hughie Lewis* and *People v Charles Howard,* 417 Mich 885; 331 NW2d 224 (1983); *People v Mallory,* 417 Mich 886; 331 NW2d 224 (1983).

descriptions relayed with the dispatch. As a result, the patrol officers arrested defendants. It was around 11 p.m. Subsequently, it was discovered that a small sum of money and a watch were missing from Cheatham's person. Cheatham died the following afternoon of injuries inflicted during the assault.

During the morning of January 13, 1978, a police sergeant obtained a "reverse writ" from a magistrate. A reverse writ was a unique procedure through which Detroit police sought to justify detention of arrestees. See *People v Casey,* 411 Mich 179; 305 NW2d 247 (1981). Another police officer obtained a second reverse writ the following morning because each was thought to be valid for only one day. At that time, the officer noticed what he thought might be blood on Mallory's shoes.

Around 5 p.m. on January 14, 1978, defendants were placed in several lineups. The eyewitness identified Mallory and Lewis as O'Dell Cheatham's assailants. The witness also remarked that the assailants appeared to have jumped on Cheatham as he lay on the ground. On the basis of that statement, around 8 p.m., a police officer seized Mallory's shoes from him while he was in detention. The officer did not have a search warrant.

Also during the evening of January 14, Howard's sister arrived at the police station to visit her brother. One of the investigating officers accompanied Howard from his cell to a visiting area. During the course of that brief journey, the officer remarked to Howard that Mallory and Lewis had been positively identified as Cheatham's assailants. In response, Howard stated that if they were identified, he was identified, because he had been with them the entire evening of January 12. Howard had been advised of his right to remain silent sometime the previous day by another officer.

Arrest warrants were issued, and defendants

were finally arraigned on the morning of January
15, 1978. Defendants were charged with first-de-
gree felony murder, predicated on an underlying
larceny, and were tried jointly.

At trial, all defense counsel rigorously cross-ex-
amined the eyewitness to O'Dell Cheatham's beat-
ing in an attempt to show that the witness' identi-
fications of defendants and of the car were suspect.
In response, the prosecution moved that the jurors
be taken to the crime scene so that they could
observe firsthand the view which the eyewitness
had from his apartment. The trial judge permitted
the jury view, but, although all defense counsel
were present during the view, did not allow defen-
dants to accompany the jury.

During the course of trial, Mallory's shoes were
admitted into evidence. Expert testimony estab-
lished that the victim's blood type was the same as
that found on the shoes and that Mallory's blood
type was different. Howard's statement to the
police officer regarding identification was also ad-
mitted into evidence. The jury returned a verdict
of guilty as charged.

## II. ISSUES

Defendants raise a plethora of issues for our
consideration. They all allege that the trial court
erred so as to require reversal by: (1) excluding
them from the jury view of the crime scene, (2)
failing to instruct the jury that the underlying
larceny for purposes of felony murder must have
been a felony, (3) instructing the jury so as to
remove from its consideration the element of mal-
ice, (4) admitting testimony that the victim was
dying of cancer, and (5) employing the struck jury
selection method. Howard and Lewis also chal-
lenge the voluntariness of Howard's statement to

the police and claim that their trial counsel rendered ineffective assistance. Individually, Mallory claims that evidence of his shoes and the associated blood tests should have been suppressed; Howard claims that his motions to quash the information, for a directed verdict, and for a new trial were improperly denied; and Lewis challenges his detention under the reverse writs.

A. *Reverse Writ.*

The reverse writ procedure under which defendants were held for approximately 60 hours before being arraigned on proper complaints and warrants was "without legal effect and may not be employed to justify the detention of a citizen," *i.e.,* "[i]t is a nullity" having no constitutional or statutory bases. *Casey, supra,* pp 180-181. Defendants Mallory and Howard challenge the admissibility at trial of several major pieces of evidence against them which were obtained by the police from defendants during detentions pursuant to the two reverse writs.

When a person is the subject of a felony arrest without a warrant, two statutes require that the person be brought promptly before a magistrate for arraignment on a complaint and warrant.

"A peace officer who has arrested a person for an offense without a warrant shall without unnecessary delay take the person arrested before a magistrate of the judicial district in which the offense is charged to have been committed, and shall present to the magistrate a complaint stating the charge against the person arrested." MCL 764.13; MSA 28.871(1).

"Every person charged with a felony shall, without unnecessary delay after his arrest, be taken before a magistrate or other judicial officer and, after being informed as to his rights, shall be given an opportunity publicly to make any statement and answer any ques-

tions regarding the charge that he may desire to answer." MCL 764.26; MSA 28.885.

Similarly, if with less specificity, the state constitutional guarantee of due process of law requires an arrestee's prompt arraignment. Const 1963, art 1, § 17. Both the constitutional and statutory requirements are designed to advise the arrestee of his constitutional rights and the nature of the charges against him by an impartial judicial magistrate, to insure that the arrestee's rights are not violated,[3] and to afford the arrestee an opportunity to make a statement or explain his conduct in open court if he so desires. Further, prompt arraignment is of particular importance when, as here, a person is arrested without a warrant. In such situations, arraignment provides a *judicial* determination of probable cause which would not otherwise occur until the preliminary examination.[4] Finally, prompt arraignment affords the arrestee an opportunity to have his right to liberty on bail determined.[5]

---

[3] Prompt arraignment prevents police officers from conducting secret interrogations. *Mallory v United States,* 354 US 449; 77 S Ct 1356; 1 L Ed 2d 1479 (1957); *Upshaw v United States,* 335 US 410; 69 S Ct 170; 93 L Ed 100 (1948); *People v Hamilton,* 359 Mich 410, 415-416; 102 NW2d 738 (1960).

[4] The dissent maintains that a judicial determination of probable cause was made after defendants' arrests when the complaint was filed and arrest warrants were issued. Regardless of whether this determination satisfied constitutional requirements, it clearly did not satisfy MCL 764.13; MSA 28.871(1). Furthermore, this determination occurred three days after the arrests. The arraignment statutes require not only a judicial determination of probable cause, but a prompt one.

[5] The dissent states that since the magistrate at the reverse writ proceeding had the authority to set bond, defendants were afforded an opportunity "by their appearance" to have the issue of bond considered. We disagree. As described in *Casey, supra,* 411 Mich 180, fn 1, the reverse writ procedure was generally informal and without any documentation. The only purpose of the proceeding was to keep the arrestee in custody without issuing an arrest warrant. It therefore would have been extremely unlikely that the magistrate who allowed

Since the aforementioned statutory right to prompt arraignment was violated by the reverse writ procedure, defendants' detentions were unlawful.[6] The next step is to determine whether Mallory's shoes, the results of the blood tests performed on them, and Howard's statement should have been suppressed. In the past, we have imposed the exclusionary rule as the appropriate remedy whenever a statutorily unlawful detention has been employed as a tool to extract a *statement*. See *People v White*, 392 Mich 404, 424; 221 NW2d 357 (1974), *cert den sub nom Michigan v White*, 420 US 912; 95 S Ct 835; 42 L Ed 2d 843 (1975), and the authorities cited therein. These statements are excluded, even if they were given voluntarily, because they might never have been made by the detainee but for the illegal prearraignment delay. Physical evidence, in contrast, often exists regardless of the length of the prearraignment delay. However, if the primary purpose of the *White* exclusionary rule is to deter police misconduct in obtaining evidence against a detainee, the nature of the evidence which is impermissibly obtained should not be determinative. If the physical evidence would not have been discovered but for the exploitation by the police of the illegal prearraignment delay, suppression is required.

We therefore hold that the *White* exclusionary rule shall be applied whenever a statutorily unlawful detention has been employed as a tool to directly procure *any* type of evidence from a de-

the police to detain defendants without the benefit of a warrant would have also allowed defendants to be freed on bail.

[6] For purposes of our analysis, we assume that the police had probable cause to arrest defendants and that those arrests were effectuated in a lawful manner. However, we do not decide those questions.

tainee. See *People v McCoy,* 29 Mich App 589, 591-592; 185 NW2d 588 (1971). Moreover, the exclusionary rule will bar any other evidence which would not have been discovered but for that direct procurement.

Obviously, not all evidence acquired directly or indirectly from a detainee during a statutorily unlawful detention will be procured by exploiting that detention, *e.g.,* a statement volunteered absent police prompting or questioning, *White, supra,* pp 424-425, a voluntary statement made shortly after a lawful arrest, *People v Stinson,* 113 Mich App 719, 730-731; 318 NW2d 513 (1982); *People v Ricky Smith,* 85 Mich App 32, 46-47; 270 NW2d 697 (1978); *People v William Turner,* 26 Mich App 632, 638-639; 182 NW2d 781 (1970), the inadvertent discovery of physical evidence on the detainee's person or in the detainee's personal effects absent a general plan or pattern to marshal evidence against the detainee, *People v Griffin,* 33 Mich App 474, 477-478; 190 NW2d 266 (1971), or any evidence obtained by means sufficiently distinguishable to be purged of the taint of the unlawful detention. The exclusionary rule will not bar the admission at trial of evidence which has been acquired absent exploitation of a statutorily unlawful detention. *Cf. People v Walters,* 8 Mich App 400; 154 NW2d 542 (1967).

Turning first to Mallory's shoes and the blood tests performed on them, we find that that evidence was improperly admitted at trial. Unquestionably, the shoes were seized during a period of unlawful detention. Further, we conclude that the police employed the detention as a device to generally marshal evidence against the defendants. The shoes were seized 45 hours subsequent to the arrests, after two reverse writs had been obtained

and a lineup conducted.[7] Likewise, the blood tests performed on the shoes would not have been obtained but for the seizure of the shoes, *i.e.*, they were not obtained by means sufficiently distinguishable to be purged of the primary taint of the unlawful detention. Accordingly, Mallory's shoes, and the associated blood tests, were inadmissible at trial because they were the fruit of the poisonous tree. See, *e.g.*, *Wong Sun v United States*, 371 US 471, 488; 83 S Ct 407; 9 L Ed 2d 441 (1963).

Likewise, Howard's statement that he had been

---

[7] In the event of a prompt arraignment, bail might have been set and Mallory would not have been in custody. Remember that the victim did not die until the afternoon of January 13, 1978. Defendants were arrested for felonious assault on January 12, 1978. Thus, a prompt arraignment would have seen defendants charged with a bailable offense. See Const 1963, art 1, § 15. Accordingly, the blood on the shoes might not have been discovered as it was.

Neither *Hancock v Nelson*, 363 F2d 249 (CA 1, 1966), *cert den* 386 US 984; 87 S Ct 1292; 18 L Ed 2d 234 (1967), nor *United States v Edwards*, 415 US 800; 94 S Ct 1234; 39 L Ed 2d 771 (1974), requires a different result. In *Nelson*, defendants filed a habeas corpus petition challenging the admissibility of their bloodstained clothes, which had been surrendered during a detention that was illegal under state statutory law. The first circuit held, *as a matter of federal constitutional law*, that the clothes were properly seized during a lawful search incident to arrest. *Nelson, supra*, pp 252, 255. However, the court noted that *as a matter of federal procedural law*, a violation of the federal prompt arraignment statutes would have resulted in suppression under *Mallory, supra*, and *McNabb v United States*, 318 US 332; 63 S Ct 608; 87 L Ed 819 (1943). The *Nelson* Court also noted that a state could similarly exclude evidence obtained during statutorily unlawful detentions either by judicial decision or statute, although no state had yet done so. *Nelson, supra*, pp 253-254. However, *Nelson* was decided eight years before this Court adopted the *White* exclusionary rule.

In *Edwards*, the United States Supreme Court held that as a matter of federal constitutional law, once an accused has been lawfully arrested and is in custody, his clothes may be lawfully searched and seized without a warrant, even if the search and seizure occurs well after the arrest and administrative processing, and even if no probable cause to search exists. *Edwards*, like *Nelson*, based this conclusion on the "search incident to arrest" exception to the warrant requirement. *Edwards, supra*, pp 802-805. However, no statutorily unlawful prearraignment delay had occurred in *Edwards*. If there had been such a delay, the federal *McNabb-Mallory* rule could have required suppression.

with Mallory and Lewis the entire evening was improperly admitted at trial. The statement was obtained during a period of unlawful detention. Further, we conclude that the delay in arraignment was employed not only as a device to generally marshal evidence against the defendants, but as a tool to extract statements from defendants. Howard's statement was obtained only after the lineup had been conducted and he was confronted with the fact that Mallory and Lewis had been positively identified. When a statutorily unlawful detention is employed as a tool to extract a statement, we have traditionally imposed the *White* exclusionary rule.[8]

---

[8] An identical result is reached when the starting point is a constitutionally unlawful detention. A statement which is solely the product of an illegal arrest is constitutionally inadmissible. *Wong Sun, supra,* p 491. Although Howard's statement may have been voluntary under US Const, Am V, and Const 1963, art 1, § 17, it was still illegally obtained for purposes of US Const, Am IV, and Const 1963, art 1, § 11. See *Dunaway v New York,* 442 US 200, 217; 99 S Ct 2248; 60 L Ed 2d 824 (1979). The inquiry with respect to the latter two constitutional provisions is whether there was a causal connection between the unlawful detention and the statement. *Brown v Illinois,* 422 US 590, 602; 95 S Ct 2254; 45 L Ed 2d 416 (1975). To answer that inquiry, we look at: (1) the time lapse between the arrest and the statement, (2) the flagrancy of official misconduct, (3) any intervening circumstances, and (4) any antecedent circumstances, *i.e.,* events occurring before the arrest. See *Dunaway, supra; Brown, supra,* p 603; *People v Emanuel,* 98 Mich App 163, 177; 295 NW2d 875 (1980), *lv den* 414 Mich 871 (1982), *cert den sub nom Emanuel v Michigan,* 459 US 1220; 103 S Ct 1226; 75 L Ed 2d 461 (1983).

In this case, the time lapse between Howard's arrest and his statement regarding identification was in excess of 40 hours and there were no intervening circumstances during that time period tending to ameliorate the delay. Rather, the only intervening circumstances of significance were the several lineups conducted, which were part of the general police plan to marshal evidence against defendants and at which Mallory and Lewis were positively identified. Howard's statement was a direct result of those identifications. Those identifications would not have taken place but for the unlawful detentions of all defendants. A lineup "is not the kind of intervening circumstance which tends to dissipate the taint" of an unlawful detention. *People v Casey,* 102 Mich App 595, 604, fn 6; 302 NW2d 248 (1980), *aff'd* 411 Mich 179; 305 NW2d 247 (1981). Finally, we endorse the comments of the Court of Appeals made in another case involving reverse writs:

"We also conclude that the official misconduct here was 'flagrant' in

B. *Jury View.*

In response to the prosecution's motion for a jury view of the crime scene, defense counsel pointed out that lighting and weather conditions would not be the same, *i.e.,* Cheatham's beating occurred at 10:30 p.m. on January 12, 1978, during snowy conditions, while the proposed view would occur during daylight hours in May, 1978. Accordingly, defendants opposed the view, claiming that it would be "confusing and prejudicial." Nevertheless, the trial court permitted the view so that the jury could become acquainted with "line of sight and distances." However, the trial judge ruled that defendants could not be present at the view because he thought "[w]e have a problem of security" and "we have a problem as to whether they are prejudiced if they go to the scene in handcuffs." Before the jurors departed for the scene, the trial judge reminded them of the differences in lighting and weather conditions.

The Court of Appeals panel reviewing Mallory's conviction did not address the issue of the jury view, although it was raised, instead stating "[w]e have reviewed defendant's other allegations of trial court error and find that no reversible error exists." However, the panel reviewing the convictions of Lewis and Howard found that the trial court had erred by excluding defendants from the

the sense that it was extremely conspicuous. If one carefully examines the proceedings in this matter, the illegality of the arrest is obvious. By so finding, however, we do not wish to imply that we believe the officers in question intentionally acted improperly." *Casey, supra,* p 604.

Accordingly, Howard's statement was inadmissible at trial because it was the fruit of the poisonous tree.

"When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts." *Dunaway, supra,* p 218.

view. Nevertheless, the error was harmless because there was no reasonable possibility of prejudice from defendants' absence. *People v Hughie Lewis,* 97 Mich App 359, 365-366; 296 NW2d 22 (1980).

Permitting the jury to view the crime scene is a matter within the discretion of the trial court. GCR 1963, 513; MCL 768.28; MSA 28.1051;[9] *People v Pizzino,* 313 Mich 97, 106-107; 20 NW2d 824 (1945); *People v Greeson,* 230 Mich 124, 142; 203 NW 141 (1925); *People v Frontera,* 223 Mich 258, 260; 193 NW 782 (1923); *People v Winney,* 196 Mich 347, 366-367; 163 NW 119 (1917); *People v Auerbach,* 176 Mich 23, 46; 141 NW 869 (1913). That discretion exists even after the jury has begun its deliberations. *Pizzino, supra.* Although a trial court does not abuse its discretion by refusing a jury view when conditions at the crime scene have changed between the time of the crime and the time of trial, *Frontera, supra,* we cannot say that the trial court abused its discretion in permitting a view in this case because lighting and weather conditions were not identical. The jurors were fully apprised by the trial judge and by defense counsel of those differences. Further, on the basis of the evidence which the jurors had already heard and on their own common knowledge, they would have been alerted to any such differences. The view properly helped the jurors to better understand the distances involved and to weigh the evidence admitted at trial, especially the credibility of the eyewitness.

We must now decide whether defendants were entitled to be present at the jury view. A criminal defendant has a specific statutory right to be present during his or her trial:

[9] This state has had a similar statute for almost 140 years. See RS 1846, ch 165, § 10; 1857 CL 6077; 1871 CL 7956; How Stat 9569; 1897 CL 11952; 1915 CL 15825; 1929 CL 17321; 1948 CL 768.28.

"No person indicted for a felony shall be tried unless personally present during the trial . . . ." MCL 768.3; MSA 28.1026.[10]

In *People v Auerbach, supra,* pp 47-48, this Court recognized a defendant's right to be present at a jury view. However, our decisions have generally turned upon a determination that the defendant had waived this right by failing to appear at the view while free on bail, *People v Connor,* 295 Mich 1, 6; 294 NW 74 (1940); *People v Kasem,* 230 Mich 278, 283; 203 NW 135 (1925); *Auerbach, supra,* p 47.[11] No question of waiver is presented

[10] Like the jury view statute, this statute has a long history. See RS 1846, ch 165, § 9; 1857 CL 6076; 1871 CL 7955; How Stat 9568; 1897 CL 11951; 1915 CL 15824; 1929 CL 17296; 1948 CL 768.3.

Similarly, an accused's right to be present at trial is impliedly guaranteed by the federal and state Confrontation Clauses, US Const, Am VI; Const 1963, art 1, § 20; *Illinois v Allen,* 397 US 337, 338; 90 S Ct 1057; 25 L Ed 2d 353 (1970), the Due Process Clauses, US Const, Am XIV; Const 1963, art 1, § 17; *Snyder v Massachusetts,* 291 US 97, 105-106; 54 S Ct 330; 78 L Ed 2d 674 (1934), and the right to an impartial jury, Const 1963, art 1, § 20; *People v Medcoff,* 344 Mich 108, 113; 73 NW2d 537 (1955), *overruled on other grounds People v Morgan,* 400 Mich 527; 255 NW2d 603 (1977), *cert den sub nom Cargile v Michigan,* 434 US 967; 98 S Ct 511; 54 L Ed 2d 454 (1977). The right of presence is also grounded in common law. *Snyder, supra,* p 107.

In *Snyder,* the Supreme Court held that the presence of a defendant at trial is required by the Due Process Clause to the extent that a fair and just hearing would be thwarted by his absence. *Id.,* pp 107-108, 115. However, neither the Due Process nor the Confrontation Clauses required the defendant's presence at a jury view since a view is neither a part of trial nor evidence for purposes of these clauses. *Id.,* pp 107-108, 113-115, 118-122. Nevertheless, the Court specifically noted that each state is free to regulate the procedure of its courts, in accordance with its own conception of policy and fairness, and may provide more protection to a criminal defendant. *Id.,* p 105. Most states which had decided the question at the time *Snyder* was decided had done so on the basis of their state constitutions and statutes. *Id.,* pp 118-119. We too base our decision today upon our interpretation of MCL 768.3; MSA 28.1026, and related case law, pursuant to our supervisory authority over the administration of criminal justice in our courts. See *United States v Walls,* 443 F2d 1220, 1223, fn 3 (CA 6, 1971).

[11] In *People v Raider,* 256 Mich 131, 137-138; 239 NW 387 (1931), there was a factual dispute as to whether defendant was present at the view. Although the issue was raised in *People v Hull,* 86 Mich

here since each defendant requested that he be present during the view.

*Auerbach* did not specifically articulate the source of a defendant's right to be present at a jury view. Although jurisdictions are split over whether a jury view is part of a trial, see 21A Am Jur 2d, Criminal Law, § 915, pp 379-380; 75 Am Jur 2d, Trial, §§ 72-86, pp 181-190; 30 ALR 1357; 90 ALR 597; 6 Wigmore, Evidence (Chadbourn rev), § 1803, p 342, and cases cited therein, we are persuaded that it is. A defendant has a right to be present during the voir dire, selection of and subsequent challenges to the jury, presentation of evidence, summation of counsel, instructions to the jury, rendition of the verdict, imposition of sentence, and any other stage of trial where the defendant's substantial rights might be adversely affected. See, *e.g., Snyder v Massachusetts,* 291 US 97, 106-108; 54 S Ct 330; 78 L Ed 2d 674 (1934); *People v Medcoff,* 344 Mich 108, 115-117; 73 NW2d 537 (1955), *overruled on other grounds People v Morgan,* 400 Mich 527; 255 NW2d 603 (1977), *cert den sub nom Cargile v Michigan,* 434 US 967; 98 S Ct 511; 54 L Ed 2d 454 (1977); 21A Am Jur 2d, Criminal Law, §§ 910-924, pp 374-388, and cases cited therein. Thus, the right to be present at trial is independent of and considerably broader in scope than the right of confrontation. 21A Am Jur 2d, *supra,* § 902, p 368.

A jury view may provide a defendant with an opportunity to render assistance to defense counsel at, during, or after its occurrence. For example, by being present, a defendant might ensure that the jurors do not engage in improper conduct by reporting to defense counsel improprieties which the latter did not observe. Further, any familiarity a

449, 465-466; 49 NW 288 (1891), this Court reversed defendants' convictions on the grounds of jury misconduct during the view.

defendant has with the area of the jury view might lead to recognition of significant changes in the area which should be pointed out to the jurors by later testimony or argument. Although a defendant can impart knowledge of the area to defense counsel prior to the view, the defendant's presence will make it more likely that any significant observations of aid to the defense are made. Finally, and most importantly, even a defendant unfamiliar with the area of the view may make observations of that area during the view which can be passed on to defense counsel and which might directly aid the defense.[12]

As previously noted, a defendant may waive his right to be present at a jury view by affirmative consent or by failing to appear at the view when he is at liberty to do so. Furthermore, if the defendant's conduct during trial is so disorderly or disruptive that his trial cannot be continued while he is present, defendant may lose his right to be present at a jury view entirely. See *Illinois v Allen,* 397 US 337, 342-343; 90 S Ct 1057; 25 L Ed 2d 353 (1970).[13]

---

[12] Defendants have not claimed, nor do we decide, that the refusal to allow defendants to be present at the jury view denied them the right to effective assistance of counsel.

[13] However, courts must indulge every reasonable presumption against the loss of the right to be present during trial. Furthermore, if the right is lost, it can be reclaimed as soon as defendant is willing to conduct himself in an appropriate manner. *Allen, supra,* p 343.

If the defendant waives or forfeits his right to be present at a jury view, it is clear that no additional evidence can be introduced at the view. *Raider,* fn 11 *supra,* 256 Mich 138; *People v Winney,* 196 Mich 347, 366; 163 NW 119 (1917); *Auerbach, supra,* 176 Mich 47; *Hull, supra,* 86 Mich 466. In light of our holding that a jury view is part of trial, we need not decide whether the view itself is evidence. Although our prior decisions have uniformly held that the purpose of a jury view is only to enable the jury to better understand, apply, and weigh the evidence admitted at trial, *People v Woods,* 227 Mich 403, 405-406; 198 NW 891 (1924); *People v Harrigan,* 218 Mich 235, 240-241; 187 NW 306 (1922); *Winney, supra; Auerbach, supra,* other jurisdictions and authorities have concluded that a view is evidence. See 21A

The trial judge expressed two reasons for denying defendants' presence at the jury view: (1) security problems, and (2) potential prejudice to defendants because the jury would see them in handcuffs. This Court has recognized that:

" 'Freedom from shackling and manacling of a defendant during the trial of a criminal case has long been recognized as an important component of a fair and impartial trial. 14 Am Jur, Criminal Law, § 132. Ordinarily such procedure should be permitted only to prevent the escape of the prisoner or to prevent him from injuring bystanders and officers of the court or to maintain a quiet and peaceable trial.' " *People v Duplissey,* 380 Mich 100, 103-104; 155 NW2d 850 (1968), quoting *Odell v Hudspeth,* 189 F2d 300, 302 (CA 10, 1951), *cert den* 342 US 873; 72 S Ct 116; 96 L Ed 656 (1951). Also, *People v Anderson,* 389 Mich 155, 190-191; 205 NW2d 461 (1973), *affirming* 29 Mich App 578, 582-583; 185 NW2d 624 (1971).

Consistent with those principles, a trial court may, in the exercise of its discretion, determine that shackling of the defendant when in the presence of the jury at a view is necessary on the basis of previous conduct of the defendant or other manifest circumstances. Nevertheless, in most instances, the presence of armed guards should be sufficient. See, generally, *Allen, supra,* pp 343-344; *People v Kerridge,* 20 Mich App 184, 186-188; 173 NW2d 789 (1969); *People v Havey,* 11 Mich App 69, 76; 160 NW2d 629 (1968), *lv den* 381 Mich 756 (1968); *People v William L Thomas,* 1 Mich App 118, 126; 134 NW2d 352 (1965); 21A Am Jur 2d, Criminal Law, § 846, pp 295-302.

The trial judge did not articulate why he be-

Am Jur 2d, Criminal Law, § 915, pp 379-380; 75 Am Jur 2d, Trial, § 86, pp 189-190; 3 Jones, Evidence (6th ed), § 15:24, pp 60-63; McCormick, Evidence (2d ed), § 216, pp 537-539; 6 Wigmore, Evidence (Chadbourn rev), § 1803, pp 340-346, and cases cited therein.

lieved that defendants' presence at the jury view would pose such a security risk that defendants' right to be present should be denied. Since retrial is required, we need not decide whether this decision constituted reversible error. If a jury view is held upon retrial, the trial court should take all reasonable steps necessary to protect defendants' right to be present, as well as the safety of the jurors and community at large.

C. *Other Issues.*

Several other issues also merit our attention. First, graphic testimonial evidence that the victim had terminal brain cancer, resulting in the loss of use of his right arm, was admitted at trial over the objections of defendants. We fail to see any logical or legal relevance that this evidence had to defendants' first-degree felony murder prosecution. As aptly stated by the Court of Appeals when reviewing the convictions of Howard and Lewis:

"In the case before us, the victim's physical condition was completely irrelevant to any issue in the case. There was no contention of self-defense or that the decedent was the aggressor. There was eyewitness testimony concerning the brutality of the beating that resulted in Cheatham's death. There was no need to bolster the mother's testimony that decedent's money was in his left pocket by bringing up his illness. We find that the testimony was erroneously admitted, as its only purpose was to appeal to the sympathy of the jury." *Hughie Lewis, supra,* p 367.

The panel reviewing Mallory's conviction did not address this issue, although it was raised. Although we may have found this error to have been harmless beyond a reasonable doubt in a trial free of other errors, especially as to Mallory and Lewis who were positively identified by the eyewitness, we do not decide that question. Rather, we merely

point out that this evidence should not be admitted at any retrial involving any of the defendants.

Finally, we believe that if any errors occurred in the trial court's jury selection methods or its jury instructions regarding felony murder, they will not occur at any retrial involving any of the defendants. See *People v Miller,* 411 Mich 321; 307 NW2d 335 (1981), and *People v Aaron,* 409 Mich 672; 299 NW2d 304 (1980), respectively.

### III. *Conclusion*

Defendants' convictions are reversed and this case is remanded to the Recorder's Court of Detroit for proceedings consistent with this opinion. If the defendants are retried, the shoes seized from Mallory during his unlawful detention pursuant to two reverse writs and the blood tests performed on those shoes are inadmissible as evidence. The statement regarding identification obtained from Howard during his unlawful detention pursuant to two reverse writs is also inadmissible as evidence. Evidence that the victim had terminal brain cancer is inadmissible against all of the defendants. Although the trial court did not abuse its discretion by ordering a jury view of the crime scene, defendants are entitled to be present at any view which is ordered.

WILLIAMS, C.J., and KAVANAGH and LEVIN, JJ., concurred with CAVANAGH, J.

BOYLE, J. I dissent from the majority's conclusion that the defendants' convictions must be reversed because their detention under a "reverse writ" requires suppression of a statement and evidence obtained during the detention and because they were not permitted to accompany the jury to a view of the scene.

## I. Reverse Writ and Delay in Arraignment

Although this Court has held that there is no lawful authority for the reverse writ detention proceeding, *People v Casey,* 411 Mich 179; 305 NW2d 247 (1981), this holding does not resolve the question whether where the reverse writ is employed suppression is automatically required. In *Casey,* we held only that the reverse writ had no effect on the legality of the detention. The real issue in this case is whether, regardless of the reverse writ, a 72-hour delay in the arraignment of the defendants following an arrest based on probable cause requires suppression of defendant Howard's statement and evidence seized during the period of detention.[1] Thus, I agree with the majority that resolution of this question turns upon whether violations of MCL 764.13; MSA 28.871(1) and MCL 764.26; MSA 28.885 require suppression of the challenged evidence.

The majority assumes, for purposes of analysis, that there was probable cause to arrest the defendants. I would hold that there was probable cause to arrest given my conclusion that there were "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein v Pugh,* 420 US 103, 111; 95 S Ct 854; 43 L Ed 2d 54 (1975).[2]

---

[1] See *People v Dean,* 110 Mich App 751; 313 NW2d 100 (1981); *People v Antonio Johnson,* 85 Mich App 247, 253-254; 271 NW2d 177 (1978) (Kaufman, J., *concurring*).

[2] Despite the fact that the majority assumes probable cause, it nevertheless relies on *Dunaway v New York,* 442 US 200; 99 S Ct 2248; 60 L Ed 2d 824 (1979), a case in which the prosecutor conceded that there was no probable cause to arrest the defendant. If the majority is suggesting that there was no probable cause to arrest the defendants, then I disagree with that finding. The testimony indicated that a police car was patrolling the area of East Canfield and Mt. Elliot in Detroit when the police saw a green Buick with a smashed-in

Given an arrest based on probable cause, the majority nevertheless concludes that defendant Howard's statement and the physical evidence must be suppressed because they were obtained during a period of prearraignment delay. The majority states that "the state constitutional guarantee of due process of law requires an arrestee's prompt arraignment." The majority lists as purposes for these requirements: to advise the arrestee of constitutional rights and the nature of the charges, to ensure that those rights are not violated, to afford the arrestee an opportunity to have his right to liberty on bail determined and to make a statement in open court and, in the case where a person is arrested without a warrant, to have a prompt determination of probable cause. The analysis which follows demonstrates that the fundamental purposes of the statutory requirement have been satisfied, and that there is no reason in Michigan or federal constitutional precedent warranting the conclusion that an exclusionary rule should be applied in these circumstances.

Initially, I note that the prompt arraignment requirement is not a constitutional rule, but, rather, is a rule formulated by the United States Supreme Court "[i]n the exercise of its supervisory authority over the administration of criminal justice in the federal courts." *McNabb v United States,* 318 US 332, 341; 63 S Ct 608; 87 L Ed 819 (1943).[3] Properly stated, the constitutional require-

rear end. Three black men were standing beside it. A few minutes earlier, a report came over the radio of a felonious assault that took place approximately two blocks away and less than one hour previously. The assailants were described as three black males in a green Buick with damage to the rear of the vehicle. I find that the police had probable cause to arrest the defendants on the basis of number of men observed, the similarity of the description of the car, and the proximity of the car to the scene of the crime.

[3] See, also, *Mallory v United States,* 354 US 449; 77 S Ct 1356; 1 L Ed 2d 1479 (1957).

ment is a Fourth Amendment requirement of a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest. *Gerstein v Pugh, supra.* In this case a judicial determination of probable cause was made three days after arrest when the arrest warrants issued.

With respect to the statutory requirements for prompt arraignment, I agree with the majority's observation that in the past the exclusionary rule has been employed as an appropriate remedy for a statutory violation "[o]nly when the delay has been employed as a tool to extract a statement." *People v White,* 392 Mich 404, 424; 221 NW2d 357 (1974), *cert den* 420 US 912 (1975). I disagree with the majority's expansion of this rule to require the suppression of physical evidence and with the conclusion that the detention in this case was used as a tool to obtain Howard's statement and Mallory's shoes.

The majority correctly states that one of the purposes for the prompt arraignment requirement is to advise the arrestee of his constitutional rights. The lower court record reveals, however, that Howard was twice advised of his constitutional rights prior to making his statement: once by a police officer and once by the judge at the reverse writ proceeding and that all defendants were also advised of the nature of the charges at the reverse writ proceeding.

Prompt arraignment assures that the accused is *judicially* advised of his constitutional rights, making submission to subsequent police interrogation less likely. See 1 Wright, Federal Practice & Procedure (2d ed), § 72. While the reverse writ procedure may not be used to justify an otherwise illegal detention, *People v Casey, supra,* it does not follow that advice of rights actually given should

be similarly treated as a nullity, particularly where, as here, it cannot be successfully contended that the delay was for the purpose of obtaining a confession.[4]

Moreover, even if the defendants had not been advised of their constitutional rights, the circumstances of the police officer's conversation did not consist of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v Innis,* 446 US 291, 301; 100 S Ct 1682; 64 L Ed 2d 297 (1980). The police officer's comments were not particularly evocative, nor was there any suggestion that the defendant was particularly susceptible. There is no assertion that Howard was subjected to continuous interrogation up to the time he gave this statement. At the time Howard made this statement he was being transported to visit his sister. Thus, he was not given the impression that he would be held incommunicado until an incriminating statement was obtained.

With respect to the right afforded to the arrestee to have his right to liberty on bail determined, I note that the defendants had a constitutional[5] and statutory[6] right to bail "before conviction," but neither provision has been interpreted to confer a right to an immediate bail determination. This conclusion is supported by the observation that in the case of misdemeanor prisoners, *immediate bail* is required by statute, MCL 780.581; MSA 28.872(1), a fact which implicitly suggests that immediate bond would not otherwise be required.[7] Indeed, the bail statute allows a court to set bail

---

[4] *People v Hamilton,* 359 Mich 410, 416; 102 NW2d 738 (1960).

[5] Const 1963, art 1, § 15.

[6] MCL 765.1 *et seq.;* MSA 28.888 *et seq.*

[7] See *People v Dixon,* 392 Mich 691; 222 NW2d 749 (1974).

only after due notice has been given to the prosecuting attorney. MCL 765.3; MSA 28.890.

Further support for this conclusion is drawn from the procedure for writs of habeas corpus which requires the physical production of the prisoner before a judge for a determination of the propriety of further detention. Pending determination of the lawful basis for the prisoner's detention, he may be released on bail, remanded to jail, or brought before the court from time to time until the court determines whether or not it is proper to discharge him. *People v McCager,* 367 Mich 116; 116 NW2d 205 (1962). Thus, there is no right to immediate bond although the magistrate at the reverse writ proceeding certainly had the lawful authority to set bond, and defendants were afforded an opportunity by their appearance to have the issue of bond considered, and to make any statement they chose to.

While this Court is certainly free to interpret the Michigan Constitution to require a higher standard for the protection of our citizens than that which the United States Constitution grants to citizens by virtue of its commands, the procedure employed here not only met but exceeded constitutional commands under both the United States Constitution and the Michigan Constitution.

Application of an exclusionary rule in the instant case must be based on the conclusion that an accused's right to formal arraignment is of such paramount importance to the integrity of our system that a voluntary statement made after *Miranda* warnings, as well as physical evidence which could have been seized pursuant to an arrest on probable cause, must be suppressed. I do not read the relevant constitutional and statutory provisions to require enforcement of a "right" to

immediate arraignment through the exclusion of relevant evidence and of a voluntary statement given prior to the setting of bail.

I find particularly disturbing the majority's extension of *People v White, supra,* to the physical evidence in question. Since this Court has never said that immediate arraignment after a probable cause arrest is required, and since the police were not holding defendants incommunicado, but were producing them at regular intervals before a judge, I can find no reason to punish them, or the people of this state for this delay. This result would apparently mean that all prisoners must be arraigned within 72 hours of their arrest on pain of loss of relevant evidence, regardless of whether that evidence has been discovered by coercive means or actual exploitation of the delay. While the majority couches its result in terms of evidence "directly" procured from a detainee, the fact of the matter is the evidence became known to the police because they discovered a witness who said he had seen defendants "stomping on the head" of the deceased. It was this witness' statement which led to the seizure of the shoes, and the delay can only be relevant because "but for" its existence the shoes likely would have been beyond the ability of the police to reach.

Footnote 7 of the majority opinion discloses this analysis. The majority there notes that defendants were charged with felonious assault until the decedent died; therefore they might have been bailed out had they been arraigned and "[a]ccordingly, the blood on the shoes might not have been discovered as it was." Whether defendants would have been able to make bail and what it would have been are matters of pure supposition, but it is this speculation on which the exploitation argument rests; *i.e.,*

but for defendants being in custody, the shoes (and the blood) would never have been discovered.[8]

The majority's suppression of physical evidence seized from defendant Mallory during the unlawful detention finds no support in the precedent of this Court. While this Court has required the suppression of physical evidence obtained in violation of a defendant's statutory right to immediate bail in cases of misdemeanor arrests, *People v Dixon,* 392 Mich 691; 222 NW2d 749 (1974), it has not extended that rule to physical evidence seized or identification obtained during a period of delay in arraignment following an arrest on probable cause for the commission of a felony.

A confession obtained during a period of unlawful delay before arraignment, even if it is voluntarily given, might never have been made by the defendant but for the lengthy detention. Thus, such a confession is inculpatory evidence that never would have existed but for the violation of the defendant's statutory rights. In contrast, physical evidence or identification testimony exists independently of the defendant's detention. While an unlawful detention may result in the police learning of the existence of the evidence or may facilitate the seizure of the evidence, the existence of the evidence does not result from the unlawful detention. See, *e.g., Hancock v Nelson,* 363 F2d 249, 254 (CA 1, 1966), *cert den* 386 US 984 (1967),

[8] I can see little distinction between this situation and that of an individual arrested on probable cause in an outstate county on a Friday, who while awaiting arraignment on Monday (or later) by a magistrate, is observed on Sunday evening to have blood on his shoes. In each situation "but for" the delay the shoes would not have been noticed and seized. Indeed, the only distinction between this hypothetical situation and the instant case is that the reverse writ procedure here employed benefited the defendants. I cannot agree that a statute passed in the context of conditions which then (and now in certain areas) did not assure the immediate presence of an arraigning judge was intended to exclude evidence under these circumstances.

which found no error in the failure to suppress evidence of a dead body and the defendant's clothes seized during an unlawful detention of the defendant. The court explained:

"In the confession cases there might arguably, in certain situations, be a causal connection between the over-long detention and the confession. The impatience, frustration and confusion involved in the delay might have tended to induce the confession.

"When, as in the instant case, the evidence obtained during the delay is the body of a murdered man, the fact that his murderers were illegally detained in jail had no causal relation to the existence or location of the body. We have held above that at the time of the surrender by the appellees of their clothing, they were under lawful arrest and subject to constitutional search of their persons. But even if it were not so, and they were still under statutorily illegal detention when they surrendered their clothes, the fact of the detention had nothing whatever to do with the presence of blood and telltale bits of fabric and plastic on their clothes and shoes."

The purpose of the exclusionary rule "is to deter —to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Mapp v Ohio,* 367 US 643, 656; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), quoting *Elkins v United States,* 364 US 206, 217; 80 S Ct 1437; 4 L Ed 2d 1669 (1960). Even if I were writing on a clean slate, which the previously cited cases show clearly I am not, I would not create a rule requiring the suppression of this evidence. Simply stated, there is no constitutional guarantee which requires such result, and the statutory right to prompt arraignment should not be extended to require suppression where all of its purposes were met by the procedure employed.

Moreover, the "imperative of judicial integrity,"

*Elkins v United States, supra,* p 222, does not require the creation of an exclusionary rule. In 1962, this Court held in *People v McCager,* 367 Mich 116; 116 NW2d 205 (1962) (opinion of SOURIS, J.), that when an accused was produced in court following arrest in response to a writ of habeas corpus, the accused's continued detention became the exclusive responsibility of the judge who issued the writ and a confession thereafter made was not during a period of illegal detention. Thus, unlike the situation in *Elkins, supra,* p 223, there can be no legitimate argument that the court was "an accomplice[ ] in the willful disobedience" of the law.

The exclusionary rule is a " 'blunt instrument, conferring an altogether disproportionate reward not so much in the interest of the defendant as in that of society at large.' " *United States v Burke,* 517 F2d 377, 386 (CA 2, 1975) (Friendly, J., quoting *United States v Dunnings,* 425 F2d 836, 840 [CA 2, 1969], *cert den* 397 US 1002 [1970]). In deciding whether to apply the exclusionary rule in a situation where the violation of FR Crim P 41 was not of constitutional magnitude, Judge Friendly examined (1) whether there was "prejudice" to the defendant in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, and (2) whether there was evidence of intentional and deliberate disregard of a provision in the rule.

Examining these considerations in reverse order, I note that the conduct in question was not in deliberate disregard of the statutory prompt-arraignment requirement. See *McCager, supra.* Moreover, this Court can take judicial notice of the fact that a court order in effect at the time of the defendants' arrest required the production of

felony defendants within 12 hours of arrest.[9] Insofar as "prejudice" is concerned, the police could have properly seized Mallory's shoes upon his arrest, and the delay in arraignment did not render the seizure of the shoes invalid. See *United States v Edwards*, 415 US 800; 94 S Ct 1234; 39 L Ed 2d 771 (1974).[10]

Finally, while the interjection of the decedent's terminal brain cancer was erroneous, I agree with the Court of Appeals resolution of this issue.

I, therefore, conclude that on the record and under the circumstances of this case, the trial court did not err in admitting evidence of defendant Mallory's shoes, the blood tests performed on them, and the statement of defendant Howard. Accordingly, I would affirm the defendants' convictions.

## II. JURY VIEW

Since a criminal defendant has a constitutional and statutory right to be present at trial, the threshold question in determining whether error requiring reversal resulted from the exclusion of the defendants from the jury view is whether a view is part of the trial.

We answer as follows: where the view is nothing more than a bare inspection of the scene of the crime, neither the constitution nor a statute requires a defendant's presence.

The majority presents no rationale for the conclusion that a jury view is part of a trial. In my

[9] *In the Matter of Detained Citizens,* Interim Order of February 28, 1973 (Murphy, J.).

[10] *People v Trudeau,* 385 Mich 276; 187 NW2d 890 (1971), does not require a different result, since the holding in that case was based on the fact that there was no probable cause to believe that the defendant's shoes seized from him while he was in jail were evidence of another crime.

judgment, MCL 768.3; MSA 28.1026 must be assumed to assure protection of a right which the presence of the defendant would have protected. While the majority notes examples of benefits obtainable by defendant's presence at a view, recitation of these benefits are policy reasons supporting a legislative judgment to require presence rather than an analysis of what the legislative guarantee was intended to provide.

For purposes of the Due Process Clause of the Fourteenth Amendment of the United States Constitution, the United States Supreme Court held long ago that a jury view without the presence of the defendant was not part of a trial. *Snyder v Massachusetts,* 291 US 97, 107-108; 54 S Ct 330; 78 L Ed 674 (1934). In so holding, the Court reasoned that "[s]o far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." The Court began its analysis by noting that if the view were nothing more than a bare inspection where nothing is said by anyone to direct the attention of the jury to one feature or another, there would be nothing the defendant could do if he were there, and almost nothing he could gain. Moreover, according to the *Snyder* Court, due process was not violated by the fact that counsel was permitted to point out particular features of the scene and to request the jury to observe them, reasoning that the difference between a view at which everyone is silent and a view accompanied by a request to note particular features is one of degree and nothing more. This conclusion rested on the centuries-old practice whereby "showers" were sworn to lead the jury to the view and to point out certain features, and the historic distinction between these views and trials.

The *Snyder* Court did not reach the issue whether the defendant's exclusion from the view violated the Confrontation Clause since, at the time *Snyder* was decided, the Sixth Amendment Confrontation Clause had not been extended to the states. The Sixth Amendment right to confront witnesses was made obligatory on the states in *Pointer v Texas,* 380 US 400; 85 S Ct 1065; 13 L Ed 2d 923 (1965). Clearly, "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v Allen,* 397 US 337, 338; 90 S Ct 1057; 25 L Ed 2d 353 (1970). In determining whether a view is a stage of a defendant's trial under the Confrontation Clause, we must consider the purpose of that constitutional provision.

The "literal right to 'confront' the witness at the time of trial forms the core of the values furthered by the Confrontation Clause." *California v Green,* 399 US 149, 157; 90 S Ct 1930; 26 L Ed 2d 489 (1970). The *Green* Court stated the purposes of confrontation thus:

> "Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." 399 US 158.

The United States Supreme Court has repeatedly stated that the primary interest secured by the Confrontation Clause is the right of cross-examination. *Davis v Alaska,* 415 US 308, 315; 94 S

Ct 1105; 39 L Ed 2d 347 (1974). See also *Pointer v Texas,* 380 US 406-407. Also protected is the interest in exposing the witness' motivation in testifying and in impeaching a witness. *Davis, supra.* Stated another way, the primary purpose of the Confrontation Clause is " 'to prevent depositions or *ex parte* affidavits . . . being used against the petitioner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " *Douglas v Alabama,* 380 US 415, 418-419; 85 S Ct 1074; 13 L Ed 2d 934 (1965), quoting *Mattox v United States,* 156 US 237; 15 S Ct 337; 39 L Ed 409 (1895).

The absence of a defendant from a jury view where no testimony is presented does not infringe this constitutional right. Plainly stated, there are no witnesses to confront, no recollections to test, and no demeanor to place before the jury. It is the testimonial evidence in court to which the Sixth and Fourteenth Amendment right to confrontation applies. The scene of the crime is not, in and of itself, a witness. 6 Wigmore, Evidence (Chadbourn rev), § 1803. Those jurisdictions that have considered whether exclusion from a jury view, where no evidence or testimony is presented, violates the Confrontation Clause of the federal or state constitutions have answered negatively. See, *e.g., Jordan v State,* 247 Ga 328; 276 SE2d 224 (1981); *Commonwealth v Darcy,* 362 Pa 259; 66 A2d 663 (1949), cert den 338 US 862 (1949); *State v Perkins,* 32 Wash 2d 810; 204 P2d 207 (1949). Those cases which held that a jury view was part of a trial did

so because the jury received evidence at the view. See Anno: 90 ALR 597; Anno: 30 ALR 1357. Moreover, while *People v Auerbach,* 176 Mich 23; 141 NW 869 (1913), and *People v Connor,* 295 Mich 1; 294 NW 74 (1940), have been cited as holding that the defendant has a right to be present at a jury view,[11] the only rule which can be gleaned from the Michigan cases regarding jury views is that nothing in the nature of testimony may be taken in the absence of the defendant. See *People v Hull,* 86 Mich 449; 49 NW 288 (1891); *People v Auerbach, supra.* I would hold that for purposes of the Confrontation Clause, a jury view where no evidence or testimony is presented is not a part of the trial at which the defendants have a right to be present.

It could also be contended that denying the defendants' attendance at the jury view infringes the defendants' Sixth Amendment right to effective assistance of counsel in that the defendants' presence is necessary to enable them to confer with counsel. Not every restriction on counsel's time or opportunity to consult with his client violates a defendant's Sixth Amendment right to counsel. See, *e.g., Morris v Slappy,* 461 US 1; 103 S Ct 1610; 75 L Ed 2d 610 (1983). A defendant's Sixth Amendment right is to assistance of counsel. The Sixth Amendment does not give the defendant a right to have counsel present at proceedings at which the defendant does not have a right to be present, *United States v Ash,* 413 US 300; 93 S Ct 2568; 37 L Ed 2d 619 (1973), although counsel's presence at the view may be essential, under some circumstances, to protect the defendant's other constitutional rights, *e.g.,* preventing the admission of evidence or jury misconduct. Of course,

---

[11] See 21A Am Jur 2d, Criminal Law, § 915, pp 379-380; *United States v Walls,* 443 F2d 1220 (CA 6, 1971).

there could be no claim here that the defendants
were denied assistance of counsel at the view, but
only that they were denied an opportunity to
confer with counsel at the jury view. Clearly, a
direct restriction on defendants' opportunity to
consult with counsel would be unconstitutional,
*Geders v United States,* 425 US 80; 96 S Ct 1330;
47 L Ed 2d 592 (1976); but the Sixth Amendment
right to effective assistance of counsel should not
be translated into a right to be present at coun-
sel's side wherever and whenever instantaneous
consultation may be helpful to the defense. See
*Commonwealth v Curry,* 368 Mass 195; 330 NE2d
819 (1975).

An examination of the purpose of a jury view
further supports the conclusion that the presence
of the defendant is not constitutionally or statuto-
rily mandated. The view may properly be de-
scribed as a "scene view," rather than an "eviden-
tiary view" (a view of evidence so large or affixed
that it cannot be brought into the courtroom). See
*Jordan v State,* 247 Ga 328; 276 SE2d 224 (1981).
A jury view of the scene is not evidence. Rather,
the purpose of a scene view is to enable the jurors
to understand the testimony they have heard in
court. *Valenti v Mayer,* 301 Mich 551; 4 NW2d 5
(1942). The purpose of a jury view emphasizes that
the view is not a situation in which the defendant
is confronted with evidence against him. This con-
clusion is further supported by the observation
that a jury view can take place after the proofs
are closed and while the jury is deliberating. See
*People v Pizzino,* 313 Mich 97; 20 NW2d 824
(1945). In short, neither due process, the right to
confrontation, the right to effective assistance of
counsel, nor the purposes of a jury view support
the conclusion that MCL 768.3; MSA 28.1026 can
properly be interpreted as a legislative directive

requiring defendant's presence at a jury view. To hold otherwise is to substitute our policy preference for that of the Legislature.

Moreover, were I to hold that a jury view was part of a trial, that conclusion would not automatically require reversal of the defendants' convictions. In *People v Morgan,* 400 Mich 527; 255 NW2d 603 (1977), *cert den* 434 US 967 (1977), this Court rejected the rule of *People v Medcoff,* 344 Mich 108; 73 NW2d 537 (1955), that injury is conclusively presumed from a defendant's every absence during the course of a trial.[12] Instead, this Court adopted the standard of *Wade v United States,* 142 US App DC 356, 360; 441 F2d 1046 (1971), *i.e.,* whether there is any reasonable possibility of prejudice.

My review of the record persuades me that the trial court prevented a reasonable possibility of prejudice through careful instruction of the jury. See, *e.g., People v Devin,* 93 Ill 2d 326; 444 NE2d 102 (1982) (no error to have jury view without defendant where trial judge gave carefully detailed instructions concerning the manner in which the view was to be conducted and defense counsel said he would be present). Moreover, the only purpose of the view was to observe the line of sight of one of the witnesses that had testified, and the jury was instructed this was the purpose of the view.[13] Because the scope of the view was so limited, defense counsel could have easily described to the defendants the line of sight observed by the jurors

[12] There is nothing in *Morgan* to suggest that this Court intended its decision to rest on federal grounds alone. Moreover, there is no meaningful distinction between the federal right to be present and the state right to be present.

[13] The trial judge instructed the jury that "the main observation that the court wants you to make will be from the windows at 6320, I think where Mr. Parker testified that he could look over towards the alley and see that."

and consulted with the defendants regarding what they knew about it. Furthermore, defense counsel was present at the view and could have noted on the record if the jurors deviated from the trial judge's careful instructions.

Finally, were this Court free to incorporate its policy preferences into the jurisprudence of this state, I would not hold as a matter of policy that a criminal defendant has a right per se to be present at a jury view. Many, perhaps most, trial courts have inadequate staff to assure that jurors remain together and free of taint from the receipt of other evidence, such as overhearing conversation of participants or citizens at the scene. To impose on this reality a rule which makes mandatory the defendant's presence, with the attendant problems of assuring the security of an incarcerated defendant while also preventing prejudice to the defendant from the jury's knowledge of that fact may well produce the result that views will simply not be held. In my judgment any rule which deprives a jury of what may, in a given situation, be a useful aid to their evaluation of the evidence is justified only by a superior competing policy. The determination whether or not there is a necessity for a jury view and whether it is feasible for the defendant to attend should be left to the discretion of the trial judge. See *Jordan v State,* 247 Ga 328; 276 SE2d 224 (1981); *Commonwealth v Curry,* 368 Mass 195; 330 NE2d 819 (1975).

In making this determination the trial court must balance the possible benefits to the defendant from attendance at the view, possible security problems if the defendant attends, if there are security problems, whether the defendant will be unduly prejudiced by having the jury see him or her in handcuffs or shackles, and whether this prejudice outweighs any benefit of having the

defendant present. In the instant case, defendants did not present to the court any particularized statement of benefit to the defense, and on this record I find no error in the trial court's denial of defendant's request.[14]

BRICKLEY, J. I concur in the opinion of Justice BOYLE in all respects, save one. I cannot agree that a jury view is not part of the trial. On that point I agree with the opinion of Justice CAVANAGH. In *People v Morgan,* 400 Mich 527; 255 NW2d 603 (1977), *cert den sub nom Cargile v Michigan,* 434 US 967 (1977), this Court held that a defendant's absence from a trial is subject to the harmless error rule. Defendant has identified no actual harm as a result of his not being present at the jury view, and no harm is apparent from the record. Since the jury view concerned a witness' view of the crime scene from his (the witness') apartment, it is highly improbable that defendant's presence could have in any way aided his defense. Therefore the error should be deemed harmless.

I do not find any impediment to an application of the harmless error rule in MCL 768.3; MSA 28.1026, which states that a "person indicted for a felony shall [not] be tried unless personally present during trial," but that persons charged with misdemeanors may "at their own request . . . be put on trial in their absence." This Court has previously looked to whether the defendant was prejudiced by the absence at trial when applying

---

[14] There may be a situation where it is peculiarly necessary to have the defendant present at a view. Such a situation may arise where the defendant does not deny his presence at the scene at a relevant time and his line of vision is highly relevant to an issue in the case, thus, making his presence necessary to assure that the jury is making its observations from the proper place. *Cf. People v Zakoura,* 145 Kan 804; 68 P2d 11 (1937). The record in this case reveals that the trial judge gave due consideration to these concerns.

the statute. See *People v Raider,* 256 Mich 131; 239 NW 387 (1931). Therefore, defendants' convictions should be affirmed.

Ryan, J., concurred with Brickley, J.